**AMP INCORPORATED, Appellant,**

v.

**UNITED STATES of America.**

**No. 86–5412.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 11, 1987.
Decided June 4, 1987.

---

Gordon W. Gerber (argued), Dechert, Price & Rhoads, Philadelphia, Pa., for appellant.

Michael L. Paup, Chief, Appellate Section, David E. Carmack, Michael J. Roach (argued), Tax Div., Dept. of Justice, Washington, D.C., Mary C. Spearing, Asst. U.S. Atty., Harrisburg, Pa., for appellee.

Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and RODRIGUEZ, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal concerns one aspect of the federal tax deduction available to an employer for its contributions to an employee pension plan. Because we conclude that federal law does not limit the amortizable base to be used in calculating an employer's deduction for its pension plan's past service liability to the portion that remains unfunded in a tax year, we will vacate the judgment of the district court and enter summary judgment for the appellant-taxpayer.

### I.

Neither party contests the relevant facts in this dispute. Through the end of 1975, AMP Incorporated ("AMP"), a New Jersey corporation that identifies its principal place of business as Harrisburg, Pennsylvania, maintained two distinct retirement plans for its employees. Together, the assets of these plans exceeded their liabilities by almost two million dollars. On January 1, 1976, AMP merged the assets of these two plans into the AMP Pension Plan, a new plan that was designed to comply with the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 829. Each of the prior plans thus ceased to exist, and the members of each plan became members of the AMP Pension Plan. The new plan contained new rules governing plan participation, vesting and benefit accrual, and its new benefit formulas increased the benefits payable to plan participants and their beneficiaries. As a consequence of these liberalized benefits, the

---

* Honorable Joseph H. Rodriguez, United States District Judge for the District of New Jersey, sitting by designation.

past service liability[1] of the new plan at the time of the merger stood at $15,612,535. Due to such factors as the experience gains of the predecessor plans, however, only $12,301,375 of the past service liability of the new plan was unfunded[2] as of January 1, 1976.

Section 404(a)(1) of the Internal Revenue Code, as amended,[3] limits in a number of ways the allowable deduction for an employer's contributions to a pension plan. *See* 26 U.S.C. § 404(a)(1) (1982). In calculating its overall tax liability for the calendar year 1976, including its deduction under this Code section, AMP looked to the new plan's past service liability of $15,612,535 (i.e., both the funded and unfunded portions thereof). AMP apparently concluded that the lesser figure—the plan's $12,301,375 unfunded past service liability—was not relevant in determining its federal tax liability.

## II.

The procedural history of this dispute is similarly straightforward. In its tax return for 1976, AMP calculated its overall liability at, and therefore paid, more than fifteen million dollars in federal income taxes. This return was subsequently audited by the Internal Revenue Service ("I.R.S."). In October, 1981, AMP consented, under protest, to the I.R.S.'s additional assessments against AMP's 1976 return.[4] In No-

vember, 1981, the I.R.S. terminated its appellate consideration of AMP's protests. Therefore, on December 11, 1981, AMP paid $1,106,358 in additional federal income taxes for 1976 and $362,828.97 in interest.[5] The I.R.S. District Director subsequently disallowed in full AMP's claim for a refund on its 1976 taxes.

This action against the United States was filed, pursuant to 28 U.S.C. § 1346 (1982),[6] on October 28, 1983. On AMP's motion for summary judgment and the United States's motion for partial summary judgment, the district court referred the case to a United States Magistrate, J. Andrew Smyser, who recommended that AMP was legally entitled to deduct the portion of its pension plan's past service liability that was already funded and thus was entitled to summary judgment on the so-called pension plan controversy.[7] The district court did not, however, accept this recommendation. Rather, applying what it considered to be the "practical construction o[f] the statute," the district court concluded that only the unfunded portion of AMP's pension plan's past service liability could be considered for purposes of the federal tax deduction and entered summary judgment for the government. *AMP, Inc. v. United States*, No. 83–1569, mem. op. at 3 (M.D.Pa. May 28, 1985). This appeal followed.

---

1. "Past service liability" is an actuarial measurement of the cost of all the benefits to be supplied under a pension plan. It is based upon the service that employees provided the employer before the inception or most recent modification of the pension plan.

2. When a pension plan holds insufficient assets at a given point in time to satisfy fully its past service liability, the gap is called "unfunded."

3. Throughout this opinion, references to the Internal Revenue Code are to the 1954 Code, and not to the new Internal Revenue Code of 1986, as it has been designated by § 2(a) of the Tax Reform Act of 1986, 100 Stat. 2085.

4. This consent by AMP, filed on I.R.S. Form 870AD, reserved its right to file and prosecute claims for refunds on taxes paid as a result of these additional assessments. *See* Complaint ¶ 138; Joint Appendix at 47.

5. On April 28, 1982, AMP made an additional interest payment on its 1976 federal income taxes of $7,274.68.

6. Section 1346 provides, in pertinent part, that
   (a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:
   (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws[.]
   28 U.S.C. § 1346 (1982).

7. Subsequent to the magistrate's report, the parties settled all the other, unrelated issues that were originally part of this action. We therefore see no need to enumerate them here.

### III.

Our appellate jurisdiction over this dispute is conferred by 28 U.S.C. § 1291 (1982). Because interpreting a provision of the Internal Revenue Code is wholly a matter of statutory construction, our standard of review is plenary. *Wheeler v. Heckler,* 787 F.2d 101, 104 (3d Cir.1986); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981).

■ The question in this appeal is whether the funded portion of AMP's past service liability is to be amortized in calculating its deduction limit for tax year 1976. Because our resolution of this question turns on the precise language of the Internal Revenue Code, we preface our analysis with the relevant statutory language:

(a) General rule

If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

(1) Pension trusts

(A) In general

In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501(a), in an amount determined as follows:

\* \* \* \* \* \*

(iii) an amount equal to the normal cost of the plan as determined under regulations prescribed by the Secretary, plus, if past service or other supplementary pension or annuity credits are provided by the plan, an amount

necessary to amortize such credits in equal annual payments (until fully amortized) over 10 years, as determined under regulations prescribed by the Secretary.

In determining the amount deductible in such year under the foregoing limitations the funding method and the actuarial assumptions used shall be those used for such year under section 412, and the maximum amount deductible for such year shall be an amount equal to the full funding limitation for such year determined under section 412.

26 U.S.C. § 404 (1982). In particular, the question concerning the amortization of a plan's past service liability is whether the phrase "such credits" in § 404(a)(1)(A)(iii) ("clause iii") refers to all of that liability or only to that portion of it that is unfunded in a given tax year.

"Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive." *Consumer Prod.Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *accord Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984) ("it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses"); *FBI v. Abramson,* 456 U.S. 615, 638, 102 S.Ct. 2054, 2068, 72 L.Ed.2d 376 (1982) (O'Connor, J., dissenting) ("the plain language interpretation of a statute enjoys a robust presumption in its favor"); *Bread Political Action Comm. v. Federal Election Comm'n,* 455 U.S. 577, 584, 102 S.Ct. 1235, 1240, 71 L.Ed.2d 432 (1982) (*"Bread PAC"*) (where legislative history is "extremely sketchy[,] ... the best evidence of what Congress wanted is found in the statute itself"); *cf. TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296–97 n. 29, 57 L.Ed.2d 117 (1978) ("When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to the legislative history as a guide to its meaning."). Adhering to this principle of statutory construction, we conclude that the plain language of clause iii does not limit

AMP's amortizable base to the portion of its past service liability that remains unfunded. Clause iii expressly permits the deduction of an employer's "past service or other supplementary or pension or annuity credits." 26 U.S.C. § 404(a)(1)(A)(iii) (1982). It simply does not indicate that such credits must be unfunded, and we are unwilling to read that extra word into the statute Congress enacted.

The parties have cited, and our research has uncovered, no legislative history that bears directly upon the meaning of clause iii.[8] Our interpretation of its plain language is corroborated, however, by the language of 26 U.S.C. § 404(a)(1)(A)(ii) (1982) ("clause ii"), the deduction limit that applies to taxpayers that do not employ AMP's "unit credit" actuarial cost method of accounting. Clause ii limits the deduction of such a taxpayer to "the amount necessary to provide with respect to all of the employees under the trust the remaining *unfunded* cost of their past and current service credits...." *Id.* (emphasis added). The explicit presence of the word "unfunded" in clause ii "stands in obvious contrast" to its absence in clause iii. *Don E. Williams Co. v. Comm'r,* 429 U.S. 569, 574, 97 S.Ct. 850, 854, 51 L.Ed.2d 48 (1977).[9] As the Supreme Court noted recently, " ' "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." ' " *Rodriguez v. United States,* —— U.S. ——, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam) (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (internal citation omitted)); *cf. Jersey Shore State Bank v. United States,* —— U.S. ——, 107 S.Ct. 782, 785, 93 L.Ed.2d 800 (1987) (reading two Code sections together to determine how one "is most logically read"). The general presumption becomes particularly weighty in this instance, where Congress used the word "unfunded" in one clause but not in the very next one.[10] "We refrain from

---

**8.** The government cites various portions of the legislative history of ERISA as supporting its position. *See* Brief for the Appellee at 20–23. While we generally do not find the cited history very helpful in answering the question before us and agree that the cited legislative material is "somewhat elliptical," *id.* at 22, we also note that it ultimately supports AMP's reading of the statute. *See infra* p. 618.

**9.** In *Don E. Williams Co.,* the Supreme Court clarified the meaning of Code § 404(a), 26 U.S.C. § 404(a) (Supp. III 1985), by comparing its language to that of other Code provisions. The Court noted that the disjunctive phrases found in many of the Code's deduction provisions "are missing [from § 404(a) ], and [concluded that] their absence indicates congressional intent...." 429 U.S. at 574, 97 S.Ct. at 854. We here adhere to the Court's assumption that Congress, while drafting a particular tax deduction, does not accidentally omit from it words that it has employed in similar contexts. *Cf. United States v. General Dynamics Corp.,* —— U.S. ——, 107 S.Ct. 1732, 1737 (1987) ("That [an employer's estimated reserve representing employee medical reimbursement claims that were actuarially likely but not yet filed] w[as] not intended to fall within the 'all events' test [for deduction by an accrual basis taxpayer under Code § 162(a), 26 U.S.C. § 162(a) (1982),] is ... demonstrated by the fact that the Internal Revenue Code [elsewhere] specifically permits insurance companies to deduct additions to reserves

for such 'incurred but not reported' ... claims.").

**10.** In *Bread PAC,* unanimous Supreme Court read literally and in isolation the standing-conferring provision of the Federal Election Campaign Act of 1971, 2 U.S.C. § 437h(a) (1982). Our analysis here mirrors the Court's method of statutory analysis there:

> The obvious fact that Congress wanted a broad class of questions to be speedily resolved ... scarcely implies that Congress intended the courts to augment Congress'[s] enumeration of qualified plaintiffs. Indeed, if it suggests anything, the structure of the Act suggests that Congress knew how to specify that 'all' constitutional questions about 'any' provision of the Act may be raised, and therefore could as easily have directed that 'any' person might invoke the unique procedures of § 437h. But Congress did not do so. Instead, it went to the trouble of specifying that only two precisely defined types of artificial entities and one class of natural persons could bring these actions.

455 U.S. at 583, 102 S.Ct. at 1239; *accord Russello,* 464 U.S. at 23, 104 S.Ct. at 300 ("The argument for a narrow construction of [18 U.S.C.] § 1963(a)(1) is refuted by the language of the succeeding subsection (a)(2). The former speaks broadly of 'any interest ... acquired,' while the latter reaches only 'any interest in ... any enterprise which [the defendant] has estab-

concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship." *Russello*, 464 U.S. at 23, 104 S.Ct. at 300. In addition to making this comparison with clause ii, we also note that the final sentence of this Code section explicitly limits "the maximum amount deductible ... to the full funding limitation" of Code section 412. 26 U.S.C. § 404(a)(1)(A) (1982). AMP argues, and we are persuaded, that this statutory ceiling further indicates that Congress was both able and willing to mention a plan's funding level when it intended that fact to have legal significance. In sum, our comparison of clause iii with its surrounding provisions supports AMP's interpretation.

■ A deduction under clause iii is explicitly limited to "an amount *necessary* to amortize" a plan's past service liability. 26 U.S.C. § 404(a)(1)(A)(iii) (1982) (emphasis added). The district court based its statutory interpretation on the word "necessary." It concluded—and the government now argues to us—that this statutory "reference ... clearly requires that only unfunded past service credits be considered in determining the limit on allowable deductions." *AMP*, No. 831569, mem. op. at 4 (M.D.Pa. May 28, 1985). We regard this interpretation as erroneous. First, it conceptually equates "necessary" with "unfunded." This ignores the reality that, over time, an employer funding a past ser-

vice liability may in the future need to contribute more or less—as the plan experiences gains and/or losses—than the amount that appears to be unfunded at the given moment.[11] In addition, this interpretation assumes that Congress intended the word it used, "necessary," to substitute for the word it did not use, "unfunded." This ignores the fact that Congress used *both* words in the same sentence of clause ii. Comparing clause iii with its surrounding provisions thus again supports AMP's reading of the statute.

■ Clause iii provides for amortization "in equal annual payments (until fully amortized) over 10 years." 26 U.S.C. § 404(a)(1)(A)(iii) (1982). The government argues that this "minimum amortization period" makes it "intuitively obvious" that the deduction applies only to up to the amount of a plan's unfunded past service liability. Brief for the Appellee at 18–19. The government reasons that contributions above that amount (i.e., contributions for *funded* past service liability) would put an employer up against the full funding limitation in less than ten years.[12] We do not share this intuition, and conclude that the statute's reference to amortization "over 10 years" creates no such talisman. First, as we noted in the preceding paragraph, the regulations make it clear that the equal annual payments will be made until the full funding level has been reached, and that that total period of time will vary as a plan experiences gains and losses; amortization

---

lished[,] operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.'") (ellipses and brackets in original).

11. The government notes that, under the applicable Treasury Department regulations, a taxpayer such as AMP is required each year to create a new, 10-year amortization base that reflects its experience gain or loss. *See* 26 C.F.R. § 1.404(a)–14(g)(1) (1986) ("In the case of a plan valued by the use of a funding method which is an immediate gain type ... a 10–year amortization base must be established in any plan year equal to the net experience gain or loss required under [26 U.S.C. § 412] to be determined with respect to that plan year."); 26 C.F.R. § 1.404(a)–14(h)(1) (1986) ("*In general.* Each time a 10–year amortization base is established ... by experience gains and losses[ ] the base must ... be separately maintained in order

to determine when the unamortized amount of the base is zero."). These regulations do not, however, change the fact that the amount an employer will need to contribute to fund fully a past service liability can only be known at the moment that process is completed. (If a plan *then* experiences losses, the necessary amount will again become unknown.) In operation, the 10–year amortization bases required by the regulations are simply reduced on a proportional basis each time the employer makes another annual contribution to cover the past service liability. *See* 26 C.F.R. § 1.404(a)–14(h)(4) (1986).

12. The government calculates that AMP would, under its interpretation of clause iii, reach the full funding limitation in 7.48 years. *See* Brief for the Appellee at 19 n. 7.

is merely the actuarial process that allows an employer to deduct his contributions to past service liability, and it occurs across a staggered sum of 10–year bases. Second, consistent experience gains over time could, in light of the full funding ceiling set forth in § 404(a)(1)'s final sentence, bar these deductions before an employer reaches the mythologized "year 10" even under the government's reading of clause iii. Third, consistent experience losses over time could prevent an employer from reaching the full funding ceiling until long after "year 10."[13] Finally, we believe that the government is again trying to add a word to clause iii that Congress did not employ—clause iii refers to equal payments "over 10 years," but says nothing about the necessity of such payments occurring in a "10 year *period*." In sum, the government's interpretation of this statutory phrase is erroneous, and it sheds no light on the question whether funded portions of past service liability may be included in an employer's deductible amortization base.

■ The government's final statutory argument is based upon a House Report's statement that ERISA's amendments "put the minimum contribution requirements and maximum deduction limitations on a comparable basis." H.R.Rep. No. 807, 93d Cong., 2d Sess., at 100 (1974), U.S.Code Cong. & Admin.News 1974, p. 4639. This statement is significant, the government claims, because the minimum contribution requirements of Code § 412 refer explicitly to a plan's "*unfunded* past service liability." 26 U.S.C. § 412(b)(2)(B)(ii) (1982) (emphasis added). While there is some force to this argument, the cited passage is not such a clear expression that we will disregard the plain language of the statute before us. In addition, § 412(b)(2)(B)(ii) is simply one more indication that Congress can, and does, use the word "unfunded" in the Code when it means to do so.[14]

### IV.

For the foregoing reasons, the judgment of the district court will be vacated, and summary judgment will be entered for the appellant.

---

13. The government does, as we have noted, call the statute's reference to 10 years a "minimum" amortization period, but its argument, if consistent, must assume a rigid time period of that exact length.

14. In sum, "we read the Internal Revenue Code as Congress wrote it[, not] as the Internal Revenue Service would like us to amend it." *United States v. Jersey Shore State Bank*, 781 F.2d 974, 983 (3d Cir.1986) (Weis, J., dissenting), *aff'd,* —— U.S. ——, 107 S.Ct. 782, 93 L.Ed.2d 800 (1987).