**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**
**No. 99-60425**

**ALBEMARLE CORPORATION,**

Petitioner,

**versus**

**ALEXIS M. HERMAN, SECRETARY OF LABOR,
U.S. DEPARTMENT OF LABOR; OIL, CHEMICAL
& ATOMIC WORKERS INTERNATIONAL UNION;
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,**

Respondents.

_____

**Petition for Review of an Order of the Occupational
Safety and Health Review Commission**
_____

August 7, 2000

Before REAVLEY, DAVIS, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Concerning three OSHA citations for violations at Albemarle Corporation's chemical plant of then new process safety management standards, 29 C.F.R. § 1910.119, at issue are: the level of detail required by subpart (f)(1) for written operating procedures; whether Albemarle violated subpart (f)(4), which requires safe work practices; and whether an operator's failure to perform operating procedures without assistance demonstrates a need for refresher training and, concomitantly, violates subpart (g)(2)'s requirement

to conduct refresher training as needed.  The petition for review is **DENIED**.

I.

The standards at issue were enacted in 1992.  *See* **Process Safety Management of Highly Hazardous Chemicals; Explosives and Blasting Agents**, 57 Fed. Reg. 6356 (1992).  The citations arose out of two inspections of Albemarle's chemical facility at Pasadena, Texas.  Following the first, in November 1992, nine "serious" citations were issued.  After a hearing before an ALJ, eight were vacated.  The remaining citation concerned Albemarle's work practices in "line clearing" and "slipblinding" in the Multi-Product Unit (MP-1), with a $5,000 penalty being imposed.

The second inspection, in January 1993, followed an incident in the SWAG reactor.  Four "serious" citations were issued.  The ALJ affirmed all four, with a $5,000 penalty for each.

After Albemarle petitioned the Occupational Safety and Health Review Commission (OSHRC) for review, the Secretary of Labor voluntarily dismissed two of the five citations.  In OSHRC's first review of claimed violations of the process safety management standards for highly hazardous chemicals, the remaining three citations (one for slipblinding, two for SWAG reactor) were affirmed in April 1999, approximately three and one-half years after the ALJ's decision.

OSHRC's decisions are reviewed to determine whether they are supported by substantial evidence and in accordance with law. *E.g., S & H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1276 (5th Cir. 1981).

In pertinent part, 29 C.F.R. § 1910.119 provides:

> (f) Operating procedures
>
> (1) The employer shall develop and implement *written operating procedures* that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information and shall address at least the following elements.
>
> (i) Steps for operating each phase:
>
> (A) Initial startup;
>
> (B) Normal operations;
>
> ....
>
> (E) Emergency Operations;
>
> (F) *Normal shutdown;*
>
> ....
>
> (4) The employer *shall develop and implement safe work practices* to provide for the control of hazards during operations such as ... opening process equipment or piping....
>
> ....
>
> (g)  Training.
> ....
>
> (2)  Refresher training.  Refresher training shall be provided at least every three years,

and more often if necessary, to each employee involved in operating a process to assure that the employee understands and adheres to the current operating procedures of the process. *The employer, in consultation with the employees involved in operating the process, shall determine the appropriate frequency of refresher training.*

(Emphasis added.) Subparts (g) and (f) became effective on 26 May and 26 August 1992, respectively.

### A.

The November 1992 citation, for violation of subpart (f)(4), stated Albemarle did *not* "develop and implement safe work practices" for "the MP-1 Unit where *written* procedures for opening lines and installing slipblinds are *not* available". (Emphasis added.) "Line clearing" concerns removal of chemicals from a line prior to opening it; "slipblinding", opening the line and inserting a flat metal plate crosswise to prevent chemicals from flowing. Slipblinds are used when MP-1 changes the chemical being produced.

The ALJ affirmed: "This item was based on the [compliance officer's] determination there were *no written procedures* addressing preparing lines before opening them to install slip blinds". (Emphasis added.) Likewise, the ALJ found "there were *no written procedures* addressing line evacuation before opening them". (Emphasis added.)

OSHRC affirmed, but on different grounds. Looking to the regulation, it concluded that safe work practices did *not* have to

be *written*. It held, nevertheless, that *insufficient* safe work practices had been shown, because "only one person in the MP-1 Unit could describe a particular practice for ensuring that the pipelines were clear".

1.

Concerning this shift in bases for upholding the citation, the Secretary maintains: the regulation requires *written* safe work practices; and, because she is charged with enforcing the regulation, her interpretation is entitled to deference. *See* **Thomas Jefferson Univ. v. Shalala**, 512 U.S. 504, 512 (1994) (court owes deference to agency's interpretation of its own regulations). But, as is the case here, the Secretary's interpretation is *not* entitled to deference if it is unreasonable or contrary to the regulation's plain language. *See* **Martin v. OSHRC**, 499 U.S. 144, 156-57 (1991).

Requiring the safe work practice to be "written" is *not* found in subpart (f)(4). On the other hand, subpart (f)(1) does require "written operating procedures". Obviously, if work practices covered by subpart (f)(4) were also to be written, the regulation could — and would — have so stated. *Cf.* **Russello v. United States**, 464 U.S. 16, 23 (1983) (If Congress includes particular language in one section, but omits it in another section of the same Act, it is presumed that Congress acted intentionally and purposefully and we

will refrain from concluding the different language means the same.).

To support her interpretation, the Secretary points to the regulation's preamble, which refers to the requirement that the employer provide employees written safety and operating procedures, emphasizing hazards and safe practices. *See **Process Safety Management of Highly Hazardous Chemicals; Explosives and Blasting Agents***, 57 Fed. Reg. 6356, 6380 (1992). The preamble need be consulted, however, only when, unlike here, the regulation's plain language is ambiguous. *Cf. **Russello***, 464 U.S. at 20.

2.

In the alternative, the Secretary claims: Albemarle has *not* shown prejudice, because it was always charged with violating subpart (f)(4); and the evidence supports finding it did *not* have *sufficient* practices.

Maintaining that OSHRC improperly amended the citation from lack of written, to insufficient, practices, Albemarle contends it challenged the citation on the basis that a writing was *not* required. According to the Secretary, however, this was merely a change in legal theory, *not* an amendment, by OSHRC.

So changing the basis of the citation is *not* simply a change in legal theory. It is a change in its factual basis, an amendment. Albemarle's no-writing-requirement was a defense to

failing to have *written*, *not* a defense to failing to have *sufficient*, safe work practices.

But, Albemarle must demonstrate prejudice. The citation can be amended, even after judgment, if "evidence relevant to an unpleaded issue has been introduced at trial, without objection, from which consent to the consideration of the issue can be implied". ***Mineral Indus. & Heavy Constr. Group v. OSHRC***, 639 F.2d 1289, 1293 (5th Cir. 1981). It goes without saying that amendment "should not be permitted where it would operate to deny a party a fair opportunity to present evidence to newly-added issues". ***Id***.

At the administrative hearing, employee/operator Redd testified he had: received "no really formal training" for slipblinding; and had *not* received *written* instructions for it. Employee/operator Dixon testified he: could *not* recollect ever receiving *written* instructions for slipblinding; was instructed, when opening lines, to "proceed with caution"; and learned how to slipblind by watching others. MP-1 unit operations superintendent Runk, *called by Albemarle*, testified there was *no* standardized method for line clearing.

In sum, evidence concerning whether there were safe work practices was presented, without objection, at the administrative hearing. Accordingly, Albemarle had a fair opportunity to present evidence of its work practices and was *not* prejudiced by the

amendment. And, its employees' testimony provides substantial evidence supporting finding insufficient safe work practices.

3.

For subpart (f)(4)'s requirement to "develop and implement safe work practices to provide for the control of hazards during operations", Albemarle claims it lacked fair notice because "safe" and "control" are *not* defined. Therefore, it asserts the Secretary had to show Albemarle either knew the practices were unsafe or violated industry standards.

OSHRC did *not* find Albemarle had developed improper or substandard work practices, or that different ones were preferred. Instead, it concluded that Albemarle failed to develop safe work practices. Employees were left on their own to decide how to perform line clearing and slipblinding. That constitutes the *absence* of safe work practices. Whether the definitions of "safe" and "clear" are vague is irrelevant, in the light of the finding that safe work practices were *not* developed at all.

4.

Concerning the penalty, Albemarle maintains that the violation was *not* "serious". For a violation to be "serious", there must exist a

> substantial probability that death or serious
> physical harm could result from a condition
> which exists, or from one or more practices,
> means, methods, operations, or processes which
> have been adopted or are in use, in such place
> of employment unless the employer did not, and

- 8 -

> could not with the exercise of reasonable diligence, know of the presence of the violation.

29 U.S.C. § 666(k).

Several operators testified they had been splashed by chemicals when opening lines. Those chemicals included xylene, maelic anhydride, and DETDA, all of which can cause severe chemical burns. Recognizing that risk, Albemarle requires operators: to wear protective equipment when opening lines; and to know, prior to doing so, the location of the nearest shower (to remove splashed chemicals). In addition, when lines are opened, a dedicated safety individual must be present. Substantial evidence supports finding the violation "serious".

## B.

Albemarle's SWAG reactor is part of the plant's Olefin production area and is where the chemicals are manufactured. In January 1993, Albemarle scheduled the reactor for shutdown in order to replace valves.

Employee/operator Hewitt conducted the shutdown according to written instructions provided by supervisor Myer. Hewitt then worked a second shift and noticed that several pumps had been depressurized, indicating a system problem. He corrected the problem by "blocking and bleeding" the SWAG reactor, but only with the assistance of the foreman and supervisors. Two citations concerning this incident are at issue.

1.

Albemarle was cited for violating subpart (f)(1) — failing to have sufficiently detailed written operating procedures:

> [I]n the Olefins Units ... the specific shutdown procedures for [6 January 1993, prepared by supervisor Myer,] omitted the water supply block and bleed for the alkyl exchanger; and, the [Albemarle] ISO document 40-8.1 on SWAG shutdown did not contain sufficient detail on the procedure.

Albemarle's ten page ISO 9000 document on "Olefin Plant Shutdown for Maintenance" included eight steps for shutting down the SWAG reactor, with step eight stating: "Activate the SWAG block and bleed system". This is the only reference to activating that system. Hewitt testified that the system consists of "a series of switches that shut actuated valves that block water to and from exchangers, as well as open[ing] actuated valves that drain any water trapped on the exchanger to the sewer. On a couple of exchangers it is necessary to use hand operated chain valves".

In affirming, the ALJ found: the operator followed the supervisor's handwritten instructions; they did *not* mention activating the block and bleed system; and activating that system is vital to safely shutting down the reactor. OSHRC held that the single line in Albemarle's ISO document did *not* provide clear instructions for activating the block and bleed system and did *not* address the steps necessary for operating it.

a.

Subpart (f)(1) requires that written instructions address "[s]teps for operating each phase", including "shutdown". 29 C.F.R. § 1910.119(f)(1)(i). The daily instructions given Hewitt did *not* include activating the block and bleed system. The ISO document contains only a single sentence on the matter. Obviously, that sentence is insufficient when several switches must be activated. Furthermore, that sentence did *not* instruct on how to safely operate the system.

This notwithstanding, Albemarle contends: the single line in the ISO document was sufficiently detailed, based upon the training given its operator; it is impossible to incorporate each and every step in the document; and the regulation left to Albemarle's discretion how much detail to include.

Hewitt testified: during shutdown, he did *not* perform the block and bleed procedure, because it was *not* listed on the daily written instructions; and he could *not* remember if he had performed it the previous occasion he shut down the reactor. Substantial evidence supports finding the written instructions were *not* sufficient, given Hewitt's level of training.

b.

Concerning subpart (f)(1)'s requirement to "provide clear instructions for safely conducting activities", Albemarle contends, as it did for subpart (f)(4): it was denied fair notice because "clear" and "safely" are *not* defined and do *not* inform what level

- 11 -

of detail is required in the instructions; and, therefore, the appropriate standard is the common industry practice. Furthermore, according to Albermarle, OSHRC did *not* show that Albemarle deviated from such common industry practice.

Albemarle's daily instruction does *not* mention blocking and bleeding the reactor, and the ISO document gives *no* instruction on how to do so. Thus, how much detail "clear" and "safely" require is irrelevant, because Albemarle did *not* have written instructions on how to block and bleed.

2.

Albemarle was also cited for violating subpart (g)(2) — failure to conduct refresher training as needed:

> In the Olefins units ... the specific shutdown procedures for [6 January 1993, prepared by supervisor Myer], omitted the water supply block and bleed for the alkyl exchanger; and, the ISO document 40-8.1 on SWAG shutdown did not contain sufficient detail on the procedure, and *training was not done* to assure that each employee was aware of the requirements of the ISO procedure's direction, "Activate the SWAG block and bleed system." *Refresher training* should be sufficient to alert the employee to significant details which may be omitted or overlooked.

(Emphasis added.)

Albemarle contends: the citation should be vacated, because OSHRC affirmed a violation that was never charged (refresher training needed in handling process upsets); subpart (g)(2) requires refresher training in operating procedures, but handling

- 12 -

process "upsets" is *not* an operating procedure; Albemarle lacked fair notice that refresher training was necessary; and the Secretary did *not* show Albemarle knew such training was necessary.

### a.

Despite its claim that OSHRC amended the citation from requiring refresher training in operating the block and bleed system to handling process upsets, Albemarle was, at all times, charged with violating subpart (g)(2), based upon Hewitt *not* blocking and bleeding the SWAG reactor during shutdown and later requiring assistance to do so. Moreover, refresher training was needed to ensure Hewitt knew when, and how, to operate the block and bleed system.

The citation was *not* amended. The evidence supports the finding that Hewitt needed refresher training on SWAG shutdown, specifically that it included blocking and bleeding the reactor.

### b.

For its claim that the regulation requires refresher training on operating procedures, *not* "handling upset conditions", Albemarle is focusing on the use of the term "upset conditions" in OSHRC's opinion. Albemarle is taking the phrase out of context.

Subpart (f)(1), which requires written instructions for operating procedures, lists "normal shutdown" as such a procedure. Blocking and bleeding the SWAG reactor is part of "normal

- 13 -

shutdown". As noted, in Albemarle's ISO document, it is listed as a step for that procedure.

OSHRC held that "an operator conducting a reactor shutdown must be able to handle a potentially explosive situation without, at the last minute, having to seek the assistance of supervisors or consult the ISO procedures". Accordingly, OSHRC determined: "upset conditions" occur during reactor shutdown; and Hewitt needed refresher training in handling them.

c.

Concerning the claimed lack of fair notice, as well as failure to show, that refresher training was necessary, subpart (g)(2) requires Albemarle to consult with employees to determine when such training is necessary. It failed to do so, as evidenced by the OSHA compliance officer testifying that Albemarle was *not* so consulting. Substantial evidence supports finding that, had Albemarle complied with this aspect of the subpart, it would have known such training was necessary.

3.

Albemarle maintains there is *no* evidence to support finding, and in fact there was *no* finding, that the reactor incident was "serious". Again, a "serious" violation exists if there is a substantial probability of death or physical harm from the existing condition.

According to the compliance officer, the failure to block and bleed set up conditions where there was a tremendous release of heat and threatened the integrity of the system. The ALJ found that the failure to block and bleed caused a pressure increase, which could have resulted in an explosion. Likewise, OSHRC found: the "potential for death or serious physical harm from a SWAG reactor explosion is not disputed"; and the reactor could have exploded had the block and bleed system not been activated. Substantial evidence supports finding the violations were "serious".

III.

For the foregoing reasons, the petition for review is

***DENIED.***