# RUSSELLO *v.* UNITED STATES

No. 82–472.   Argued October 5, 1983—Decided November 1, 1983

*Ronald A. Dion* argued the cause for petitioner. With him on the brief was *Alvin E. Entin.*

*Samuel A. Alito, Jr.,* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *Sara Criscitelli.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This is yet another case concerning the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970. Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1982 ed.). At issue here is the interpretation of the chapter's forfeiture provision, § 1963(a)(1), and, specifically, the meaning of the words "any interest [the defendant] has acquired . . . in violation of section 1962."

I

On June 8, 1977, petitioner Joseph C. Russello and others were indicted for racketeering, conspiracy, and mail fraud, in violation of 18 U. S. C. §§ 1341, 1962(c) and (d), and 2. App. 5. After a jury trial in the United States District Court for

18

the Middle District of Florida, petitioner was convicted as charged in four counts of the indictment. The jury then returned special verdicts for the forfeiture to the United States, under 18 U. S. C. § 1963(a), of four payments, aggregating $340,043.09, made to petitioner by a fire insurance company. App. 54–57. These verdicts related to the racketeering activities charged in the second count of the indictment under which petitioner had been convicted. The District Court, accordingly, entered a judgment of forfeiture against petitioner in that amount. *Id.*, at 58.

Petitioner took an appeal to the former United States Court of Appeals for the Fifth Circuit. A panel of that court affirmed petitioner's criminal conviction, *United States* v. *Martino*, 648 F. 2d 367, 406 (1981), and this Court denied certiorari, 456 U. S. 943 (1982), as to that aspect of the case. The panel, however, reversed the judgment of forfeiture. App. 64–69. The full court granted rehearing en banc on the forfeiture issue and, by a vote of 16–7, vacated that portion of the panel opinion, and then affirmed the forfeiture judgment entered by the District Court. *United States* v. *Martino*, 681 F. 2d 952 (1982). Because of this significant division among the judges of the Court of Appeals, and because the Fifth Circuit majority, *id.*, at 959, stated that its holding "squarely conflict[ed]" with that of the Ninth Circuit in *United States* v. *Marubeni America Corp.*, 611 F. 2d 763 (1980), we granted certiorari. 459 U. S. 1101 (1983).[1] Since then, the Seventh Circuit has issued an opinion agreeing with the Ninth Circuit. *United States* v. *McManigal*, 708 F. 2d 276, 283–287 (1983).

---

[1] The Solicitor General, while perceiving "a factual distinction between *Marubeni* and the present case," felt that "the holding and reasoning of *Marubeni* would require the Ninth Circuit to reach the opposite result from the Fifth Circuit on the facts of the instant case." Memorandum for United States 4, n. 3. Accordingly, he joined in the prayer that a writ of certiorari be granted.

## II

So far as the case in its present posture is concerned, the basic facts are not in dispute.  The majority opinion of the en banc court described them succinctly:

> "Briefly, the evidence showed that a group of individuals associated for the purpose of committing arson with the intent to defraud insurance companies.  This association in fact enterprise, composed of an insurance adjuster, homeowners, promoters, investors, and arsonists, operated to destroy at least eighteen residential and commercial properties in Tampa and Miami, Florida between July 1973 and April 1976.  The panel summarized the ring's operations as follows:

> "'At first the arsonists only burned buildings already owned by those associated with the ring.  Following a burning, the building owner filed an inflated proof of loss statement and collected the insurance proceeds from which his co-conspirators were paid.  Later, ring members bought buildings suitable for burning, secured insurance in excess of value and, after a burning, made claims for the loss and divided the proceeds'."  681 F. 2d, at 953 (footnote omitted).

Specifically, petitioner was the owner of the Central Professional Building in Tampa.  This structure had two parts, an original smaller section in front and a newer addition at the rear.  The latter contained apartments, offices, and parking facilities.  Petitioner arranged for arsonists to set fire to the front portion.  He intended to use the insurance proceeds to rebuild that section.  The fire, however, spread to the rear.  Joseph Carter, another member of the arson ring, was the adjuster for petitioner's insurance claim and helped him to obtain the highest payments possible.  The resulting payments made up the aggregate sum of $340,043.09

mentioned above. From those proceeds, petitioner paid Carter $30,000 for his assistance.

### III

Title 18 U. S. C. § 1962(c) states that it shall be unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Section 1963(a)(1) provides that a person convicted under § 1962 shall forfeit to the United States "any interest he has acquired or maintained in violation of section 1962."

The sole issue in this case is whether profits and proceeds derived from racketeering constitute an "interest" within the meaning of this statute and are therefore subject to forfeiture. Petitioner contends that § 1963(a)(1) reaches only "interests in an enterprise" and does not authorize the forfeiture of mere "profits and proceeds." He rests his argument upon the propositions that criminal forfeitures are disfavored in law and that forfeiture statutes, as a consequence, must be strictly construed.

In a RICO case recently decided, this Court observed: "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States* v. *Turkette*, 452 U. S. 576, 580 (1981), quoting from *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). See also *Dickerson* v. *New Banner Institute, Inc.*, 460 U. S. 103, 110 (1983); *Lewis* v. *United States*, 445 U. S. 55, 60 (1980).

Here, 18 U. S. C. § 1963(a)(1) calls for the forfeiture to the United States of "any interest . . . acquired . . . in violation

of section 1962." There is no question that petitioner Russello acquired the insurance proceeds at issue in violation of § 1962(c); that much has been definitely and finally settled. Accordingly, if those proceeds qualify as an "interest," they are forfeitable.

The term "interest" is not specifically defined in the RICO statute. This silence compels us to "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards* v. *United States*, 369 U. S. 1, 9 (1962). The ordinary meaning of "interest" surely encompasses a right to profits or proceeds. See Webster's Third New International Dictionary 1178 (1976), broadly defining "interest," among other things, as a "good," "benefit," or "profit." Random House Dictionary of the English Language 741 (1979) defines interest to include "benefit." Black's Law Dictionary 729 (5th ed., 1979) provides a significant definition of "interest": "The most general term that can be employed to denote a right, claim, title, or legal share in something." It is thus apparent that the term "interest" comprehends all forms of real and personal property, including profits and proceeds.

This Court repeatedly has relied upon the term "interest" in defining the meaning of "property" in the Due Process Clause of the Fourteenth Amendment of the Constitution. See *Perry* v. *Sindermann*, 408 U. S. 593, 601 (1972) ("'property' denotes a broad range of interests"); *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 430 (1982); *Jago* v. *Van Curen*, 454 U. S. 14, 17–18 (1981). It undoubtedly was because Congress did not wish the forfeiture provision of § 1963(a) to be limited by rigid and technical definitions drawn from other areas of the law that it selected the broad term "interest" to describe those things that are subject to forfeiture under the statute. Congress selected this general term apparently because it was fully consistent with the pattern of the RICO statute in utilizing terms and concepts of breadth. Among these are "enterprise" in § 1961(4); "rack-

eteering activity" in § 1961(1) (1982 ed.); and "participate" in § 1962(c).

Petitioner himself has not attempted to define the term "interest" as used in § 1963(a)(1). He insists, however, that the term does not reach money or profits because, he says: "'Interest,' by definition, includes of necessity an interest in something." Brief for Petitioner 9. Petitioner then asserts that the "something" emerges from the wording of § 1963(a)(1) itself, that is, an interest "acquired . . . in violation of section 1962," and thus derives its meaning from the very activities barred by the statute. In other words, a direct relationship exists between that which is subject to forfeiture as a result of racketeering activity and that which constitutes racketeering. This relationship, it is said, means that forfeiture is confined to an interest in an "enterprise" itself. Petitioner derives support for this approach from *United States* v. *Marubeni America Corp.*, *supra*, and from language contained in two Federal District Court opinions, *United States* v. *Meyers*, 432 F. Supp. 456, 461 (WD Pa. 1977), and *United States* v. *Thevis*, 474 F. Supp. 134, 142 (ND Ga. 1979), aff'd on other grounds, 665 F. 2d 616 (CA5 1982). He also now relies on the *McManigal* case, *supra*, recently decided by the Seventh Circuit. Tr. of Oral Arg. 4.

We do not agree. Every property interest, including a right to profits or proceeds, may be described as an interest in something. Before profits of an illegal enterprise are divided, each participant may be said to own an "interest" in the ill-gotten gains. After distribution, each will have a possessory interest in currency or other items so distributed. We therefore conclude that the language of the statute plainly covers the insurance proceeds petitioner received as a result of his arson activities.

## IV

We are fortified in this conclusion by our examination of the structure of the RICO statute. We disagree with those

courts that have felt that a broad construction of the word "interest" is necessarily undermined by the statute's other forfeiture provisions. The argument for a narrow construction of § 1963(a)(1) is refuted by the language of the succeeding subsection (a)(2). The former speaks broadly of "any interest . . . acquired," while the latter reaches only "any interest in . . . any enterprise which [the defendant] has established[,] operated, controlled, conducted, or participated in the conduct of, in violation of section 1962." Similar less expansive language appears in §§ 1962(b) and 1964(a). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States* v. *Wong Kim Bo*, 472 F. 2d 720, 722 (CA5 1972). See *United States* v. *Wooten*, 688 F. 2d 941, 950 (CA4 1982). Had Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2). See *North Haven Board of Education* v. *Bell*, 456 U. S. 512, 521 (1982); *United States* v. *Naftalin*, 441 U. S. 768, 773–774 (1979). In the latter case, *id.*, at 773, the Court said: "The short answer is that Congress did not write the statute that way." We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.

The evolution of these statutory provisions supplies further evidence that Congress intended § 1963(a)(1) to extend beyond an interest in an enterprise. An early proposed version of RICO, S. 1861, 91st Cong., 1st Sess. (1969), had a single forfeiture provision for § 1963(a) that was limited to "all interest in the enterprise." This provision, however, later was divided into the present two subsections and the phrase "in the enterprise" was excluded from the first. Where Congress includes limiting language in an earlier version of a bill

but deletes it prior to enactment, it may be presumed that the limitation was not intended. See *Arizona* v. *California*, 373 U. S. 546, 580–581 (1963). See Weiner, Crime Must Not Pay: RICO Criminal Forfeiture in Perspective, 1981 N. Ill. U. L. Rev. 225, 238, and n. 49. It is no answer to say, as petitioner does, Brief for Petitioner 17–18, that if the term "interest" were as all-encompassing as suggested by the majority opinion of the Court of Appeals, § 1963(a)(2) would have no meaning independent of § 1963(a)(1), and would be mere surplusage. This argument is plainly incorrect. Subsection (a)(1) reaches "any interest," whether or not in an enterprise, provided it was "acquired . . . in violation of section 1962." Subsection (a)(2), on the other hand, is restricted to an interest in an enterprise, but that interest itself need not have been illegally acquired. Thus, there are things forfeitable under one, but not the other, of each of the subsections.[2]

We note that the RICO statute's definition of the term "enterprise" in § 1961(4) encompasses both legal entities and illegitimate associations-in-fact. See *United States* v. *Turkette*, 452 U. S., at 580–593. Forfeiture of an interest in an illegitimate association-in-fact ordinarily would be of little use because an association of that kind rarely has identifiable assets; instead, proceeds or profits usually are distributed immediately. Thus, construing § 1963(a)(1) to reach only interests in an enterprise would blunt the effectiveness of the provision in combating illegitimate enterprises, and would mean that "[w]hole areas of organized criminal activity would be placed beyond" the reach of the statute. *United States* v. *Turkette*, 452 U. S., at 589.

Petitioner stresses that 21 U. S. C. § 848(a)(2), contained in the Controlled Substances Act, 84 Stat. 1242, as amended, specifically authorizes the forfeiture of "profits" obtained in a continuing criminal enterprise engaged in certain drug offenses. Brief for Petitioner 6–7. The Ninth Circuit in

---

[2] There may well be factual situations to which both subsections apply. The subsections, however, are clearly not wholly redundant.

*Marubeni*, 611 F. 2d, at 766, n. 7, placed similar reliance upon § 848(a)(2) and observed that the two statutes were passed by the same Congress in the same month. We feel, however, that the specific mention of "profits" in the Controlled Substances Act cannot be accepted as an indication that the broader language of § 1963(a)(1) was not meant, to reach profits as well as other types of property interests. Language in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time. The term "profits" is specific; the term "interest" is general. The use of the specific in the one statute cannot fairly be read as imposing a limitation upon the general provision in the other statute. In addition, the RICO statute was aimed at organized crime's economic power in all its forms, and it was natural to use the broad term "interest" to fulfill that aim. In contrast, the narcotics activity proscribed by § 848 usually generates only monetary profits, a fact which would explain the use of the narrower term in § 848(a)(2).

Petitioner, of course, correctly suggests that Members of Congress who voted for the RICO statute were aware of the Controlled Substances Act. See 116 Cong. Rec. 33651 (1970) (remarks of Rep. Brotzman); *id.*, at 1180–1182 (remarks of Sen. Thurmond); *id.*, at 33631 (remarks of Rep. Weicker); *id.*, at 33646 (remarks of Rep. Kastenmeier); *id.*, at 35318 (remarks of Rep. Anderson). It is most unlikely, however, that without explanation a potent forfeiture weapon was withheld from the RICO statute, intended for use in a broad assault on organized crime, while the same weapon was included in the Controlled Substances Act, meant for use in only one part of the same struggle. If this was Congress' intent, one would expect it to have said so in clear and understandable terms.

Petitioner also suggests that subsequent proposed legislation demonstrates that the RICO forfeiture provision of 1970 excludes profits. Brief for Petitioner 29–34. The bills to which petitioner refers, however, were introduced in order to

overcome the decisions in *Marubeni*, *Meyers*, and *Thevis*. See, *e. g.*, S. 2320, 97th Cong., 2d Sess. (1982). The introduction of these bills hardly suggests that their sponsors viewed those decisions as correct interpretations of § 1963(a)(1). See *United States* v. *Gordon*, 638 F. 2d 886, 888, n. 5 (CA5), cert. denied, 452 U. S. 909 (1981). In any event, it is well settled that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Jefferson County Pharmaceutical Assn.* v. *Abbott Laboratories*, 460 U. S. 150, 165, n. 27 (1983), quoting from *United States* v. *Price*, 361 U. S. 304, 313 (1960). See also *United States* v. *Clark*, 445 U. S. 23, 33, n. 9 (1980).

Neither are we persuaded by petitioner's argument that his position is supported by the fact that certain state racketeering statutes expressly provide for the forfeiture of "profits," "money," "interest or property," or "all property, real or personal," acquired from racketeering. Brief for Petitioner 8–9. Nearly all of the state statutes postdate the *Meyers* and *Thevis* District Court decisions. See, *e. g.*, Colo. Rev. Stat. § 18–17–106 (Supp. 1982) (enacted in 1981); R. I. Gen. Laws § 7–15–3 (Supp. 1982) (enacted in 1979). The legislatures of those States presumably employed language different from that of § 1963(a)(1) so as to avoid narrow interpretations of their laws along the lines of the narrow interpretations given the federal statute by the courts in *Meyers* and *Thevis*.

V

If it is necessary to turn to the legislative history of the RICO statute, one finds that that history does not reveal, as petitioner would have us hold, see Brief for Petitioner 11–21, a limited congressional intent.

The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots. Congress' statement of findings and purpose in

enacting Pub. L. 91–452, 84 Stat. 922, is set forth in its § 1. This statement dramatically describes the problem presented by organized crime. Congress declared, *id.*, at 923: "It is the purpose of this Act to seek the eradication of organized crime in the United States . . . by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." This Court has recognized the significance of this statement of findings and purpose. *United States* v. *Turkette,* 452 U. S., at 588–589. Further, Congress directed, by § 904(a) of Pub. L. 91–452, 84 Stat. 947: "The provisions of this title shall be liberally construed to effectuate its remedial purposes." So far as we have been made aware, this is the only substantive federal criminal statute that contains such a directive; a similar provision, however, appears in the Criminal Appeals Act, 18 U. S. C. § 3731.

Congress emphasized the need to fashion new remedies in order to achieve its far-reaching objectives. See S. Rep. No. 91–617, p. 76 (1969).

> "What is needed here . . . are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts." *Id.*, at 79.

Senator Scott spoke of "new legal weapons," 116 Cong. Rec. 819 (1970), and Senator McClellan stressed the need for new penal remedies. *Id.*, at 591–592. Representative Poff, floor manager of the bill in the House, made similar observations. *Id.*, at 35193. Representative Rodino observed that "[d]rastic methods . . . are essential, and we must develop law enforcement measures at least as efficient as those of organized crime." *Id.*, at 35199. The RICO statute was viewed as one such "extraordinary" weapon. *Id.*, at 602 (remarks of Sen. Hruska). And the forfeiture provision was

intended to serve all the aims of the RICO statute, namely, to "punish, deter, incapacitate, and . . . directly to remove the corrupting influence from the channels of commerce." *Id.*, at 18955 (remarks of Sen. McClellan).

The legislative history leaves no doubt that, in the view of Congress, the economic power of organized crime derived from its huge illegal profits. See Blakey, The RICO Civil Fraud Action in Context: Reflections on *Bennett* v. *Berg*, 58 Notre Dame L. Rev. 237, 249–256 (1982). Congress could not have hoped successfully to attack organized crime's economic roots without reaching racketeering profits. During the congressional debates, the sources and magnitude of organized crime's income were emphasized repeatedly. See, *e. g.*, 115 Cong. Rec. 5873, 5884–5885 (1969); 116 Cong. Rec. 590, 592 (1970) (remarks of Sen. McClellan). From all this, the intent to authorize forfeiture of racketeering profits seems obvious. H. R. Rep. No. 91–1549, p. 57 (1970), recites that the forfeiture provision extends to "all property and interests, as broadly defined, which are related to the violations."

It is true that Congress viewed the RICO statute in large part as a response to organized crime's infiltration of legitimate enterprises. *United States* v. *Turkette*, 452 U. S., at 591. But Congress' concerns were not limited to infiltration. The broader goal was to remove the profit from organized crime by separating the racketeer from his dishonest gains. Forfeiture of interest in an enterprise often would do little to deter; indeed, it might only encourage the speedy looting of an infiltrated company. It is unlikely that Congress intended to enact a forfeiture provision that provided an incentive for activity of this kind while authorizing forfeiture of an interest of little worth in a bankrupt shell.

We are not persuaded otherwise by the presence of a 1969 letter from the then Deputy Attorney General to Senator McClellan. See Measures Relating to Organized Crime: Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st

Cong., 1st Sess., 407 (1969). That letter, with its reference to "one's interest in the enterprise" does not indicate, for us, any congressional intent to preclude forfeiture of racketeering profits. The reference, indeed, is not to § 1963(a) as finally enacted but to an earlier version in which forfeiture was to be expressly limited to an interest in an enterprise. The letter was merely following the language of the then pending bill. Furthermore, the real purpose of the sentence was not to explain what the statutory provision meant, but to explain why the Department of Justice believed it was constitutional.

The rule of lenity, which this Court has recognized in certain situations of statutory ambiguity, see *United States* v. *Turkette*, 452 U. S., at 587, n. 10, has no application here. That rule "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan* v. *United States*, 364 U. S. 587, 596 (1961). Here, the language of the RICO forfeiture provision is clear, and "the rule of lenity does not come into play." *United States* v. *Turkette*, 452 U. S., at 588, n. 10.

We therefore disagree with the reasoning of the respective courts in the *Marubeni*, *McManigal*, *Meyers*, and *Thevis* cases, and we affirm the judgment of the United States Court of Appeals for the Fifth Circuit.[3]

*It is so ordered.*

---

[3] In our ruling today, we recognize that we have not resolved any ambiguity that might be inherent in the terms "profits" and "proceeds." Our use of those terms is not intended to suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case. We hold simply that the "interests" subject to forfeiture under § 1963(a)(1) are not limited to interests in an enterprise.