CITY OF COLUMBUS ET AL. *v.* OURS GARAGE AND
WRECKER SERVICE, INC., ET AL.

No. 01–419.   Argued April 23, 2002—Decided June 20, 2002

426

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 442.

*Jeffrey S. Sutton* argued the cause for petitioners. With him on the briefs were *Traci L. Lovitt, Ronald E. Laymon,* and *Susan E. Ashbrook.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Mark B. Stern, Dana Martin, Kirk K. Van Tine, Paul M. Geier,* and *Dale C. Andrews.*

*Richard A. Cordray* argued the cause for respondents. With him on the briefs was *David A. Ferris.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Kansas et al. by *Carla J. Stovall,* Attorney General of Kansas, and *Stephen R. McAllister,* State Solicitor, joined by the Attorneys General for their respective States as follows: *Bill Lockyer* of California, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Steve Carter* of Indiana, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Eliot Spitzer* of New York, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Sheldon Whitehouse* of Rhode Island, *Mark Barnett* of South Dakota, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the City of Dallas by *Christopher D. Bowers;* for Miami-Dade County by *Leonard Leigh Elias;* for the City and County of San Francisco et al. by *Rose-Ellen Heinz, Moses W. Johnson IV, Michael F. Dean, Charles M. Hinton, Jr., Brad Neighbor, Scott H. Howard, Henry W. Underhill, Jr., Michael G. Colantuono, William B. Conners, Michael A. Cardozo, Leonard J. Koerner, George Rios, Valerie J. Armento, Debra E. Corbett,* and *Robert E. Murphy;* for the City of Toledo et al. by *Barry*

Justice Ginsburg delivered the opinion of the Court.

Federal preemption prescriptions relating to motor carriers, contained in 49 U. S. C. § 14501(c) (1994 ed., Supp. V), specifically save to States "safety regulatory authority . . . with respect to motor vehicles," § 14501(c)(2)(A). This case presents the question whether the state power preserved in § 14501(c)(2)(A) may be delegated to municipalities, permitting them to exercise safety regulatory authority over local tow-truck operations.

The federal legislation preempts provisions by "a State [or] political subdivision of a State . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." § 14501(c)(1). As an exception to this general rule, Congress provided that the preemption directive "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." § 14501(c)(2)(A). Section 14501(c)(1)'s statement of the general rule explicitly includes "State[s]" and their "political subdivision[s]." The exception for safety regulation, however, specifies only "State[s]" and does not mention "political subdivision[s]." § 14501(c)(2)(A).

We hold that § 14501(c) does not bar a State from delegating to municipalities and other local units the State's authority to establish safety regulations governing motor carriers of property, including tow trucks. A locality, as § 14501(c) recognizes, is a "political *subdivision*" of the State. Ordinarily, a political subdivision may exercise whatever portion

M. Byron, John E. Gotherman, and James G. Burkhardt; and for Coalition for Local Sovereignty by Kenneth B. Clark.

Briefs of amici curiae urging affirmance were filed for the American Trucking Associations, Inc., et al. by Evan M. Tager, Beth L. Law, and Robert Digges, Jr.; for the California Dump Truck Owners Association by Edward J. Hegarty; for the Cargo Airline Association by Paul T. Friedman, Ruth N. Borenstein, Drew S. Days III, and Beth S. Brinkmann; for the Towing and Recovery Association of America by Erik S. Jaffe and Michael P. McGovern; and for VRC LLC et al. by James C. Mosser.

of state power the State, under its own constitution and laws, chooses to delegate to the subdivision. Absent a clear statement to the contrary, Congress' reference to the "regulatory authority of a State" should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts.

I

The Interstate Commerce Act, as amended by the Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1606, and the ICC Termination Act of 1995, 109 Stat. 899, generally preempts state and local regulation "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property"; enumerated matters, however, are not covered by the preemption provision. The Act prescribes:

"(1) GENERAL RULE.—Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

"(2) MATTERS NOT COVERED.—Paragraph (1)—

"(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

"(B) does not apply to the transportation of household goods; and

"(C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck,

if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

"(3) STATE STANDARD TRANSPORTATION PRACTICES.—

"(A) CONTINUATION.—[Section 14501(c)(1)] shall not affect any authority of a State, political subdivision of a State, or political authority of 2 or more States to enact or enforce a law, regulation, or other provision, with respect to the intrastate transportation of property by motor carriers, related to—*[inter alia]* uniform cargo liability rules . . . if such law, regulation, or provision meets [various enumerated] requirements." 49 U. S. C. § 14501(c).

Tow trucks, all parties to this case agree, are "motor carrier[s] of property" falling within § 14501(c)'s compass. This reading is corroborated by § 14501(c)(2)(C), which relates to nonconsensual tows, *e. g.,* of illegally parked or abandoned vehicles. That provision plainly indicates that tow trucks qualify as "motor carrier[s] of property"; it exempts from federal preemption state and local regulation of "the price of for-hire motor vehicle transportation by a tow truck" when the towing "is performed without the prior consent . . . of the [towed vehicle's] owner or operator."

Petitioner, the City of Columbus, Ohio (City), extensively regulates the operation of any tow truck that seeks to pick up vehicles within city limits. Columbus' regulations require tow-truck operators to obtain city licenses, submit to city inspections, meet city standards for insurance and recordkeeping, and conform their vehicles to the City's detailed equipment requirements. See Columbus, Ohio, City Code §§ 549.02–549.06 (1991); App. to Pet. for Cert. 37a–52a.

Plaintiff-respondent Ours Garage and Wrecker Service, Inc., joined by a trade association of tow-truck operators, the Towing and Recovery Association of Ohio (TRAO), brought suit in Federal District Court against the City of Columbus

and two city officials to enjoin enforcement of the City's tow-truck regulations. The complaint alleged that Columbus' regulations were preempted by § 14501(c)(1). On cross-motions for summary judgment, the District Court ruled for the plaintiffs; the court declared the City's tow-truck regulations preempted and enjoined their enforcement. Columbus and its officials appealed to the United States Court of Appeals for the Sixth Circuit.

During the pendency of Columbus' appeal, the Sixth Circuit decided *Petrey* v. *Toledo*, 246 F. 3d 548 (2001). *Petrey* held that city of Toledo tow-truck regulations, resembling those of Columbus, were preempted by § 14501(c).[1] The court observed first that § 14501(c)(1)'s preemption rule explicitly applies to "a State [or] political subdivision of a State," while the exception for safety regulations, § 14501(c)(2)(A), refers only to the "authority of a State." The contrast in statutory language indicated to the court that Congress meant to limit the safety exception to States alone. *Id.*, at 563. This reading, the court further reasoned, was consistent with Congress' deregulatory purpose. "Congress intended to encourage market forces . . . through the elimination of a myriad of complicated and potentially conflicting state regulations," the court observed; "yet another level of regulation at the local level," the court inferred, "would be disfavored." *Ibid.*

Eleven weeks after rendering its judgment in *Petrey*, the Sixth Circuit decided this case. Holding *Petrey* dispositive, the appeals court affirmed the District Court's injunction against enforcement of Columbus' tow-truck regulations. 257 F. 3d 506, 507–508 (2001).

The Courts of Appeals have divided on the question whether § 14501(c)(2)(A)'s safety regulation exception to pre-

---

[1] The court excepted regulations governing the city's own purchase of towing services, which it held fell within the "municipal proprietor" exception applicable to federal preemption rules. See *Petrey*, 246 F. 3d, at 558–559.

emption encompasses municipal regulations. Compare *Petrey*, 246 F. 3d 548; *Stucky* v. *San Antonio*, 260 F. 3d 424 (CA5 2001); *Tocher* v. *Santa Ana*, 219 F. 3d 1040, 1051 (CA9 2000); and *R. Mayer of Atlanta, Inc.* v. *Atlanta*, 158 F. 3d 538 (CA11 1998) (all holding that local safety and insurance regulations are preempted), with *Ace Auto Body & Towing, Ltd.* v. *New York*, 171 F. 3d 765 (CA2 1999) (holding that local safety and insurance regulations are not preempted). We granted certiorari to resolve the conflict, see 534 U. S. 1073 (2002), and now reverse the Sixth Circuit's judgment.

## II

We begin our consideration of the question presented with an observation that is beyond genuine debate. Had 49 U. S. C. § 14501(c) contained no reference at all to "political subdivision[s] of a State," the preemption provision's exception for exercises of the "safety regulatory authority of a State," § 14501(c)(2)(A), undoubtedly would have embraced both state and local regulation. Accord, *post*, at 445 (SCALIA, J., dissenting). The Court's decision in *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597 (1991), would have been definitive. There the Court considered a provision of the Federal Insecticide, Fungicide, and Rodenticide Act authorizing a "State [to] regulate the sale or use of any federally registered pesticide or device in the State," 7 U. S. C. § 136v(a); the provision was "silent with reference to local governments." 501 U. S., at 607. "Mere silence," we held, "cannot suffice to establish a clear and manifest purpose to pre-empt local authority." *Ibid.* (internal quotation marks omitted).

As Justice White stated for the Court in *Mortier*, "[w]hen considering pre-emption, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.*, at 605 (quoting *Rice* v.

*Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)).   Furthermore, Justice White explained:

> "The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.  The exclusion of political subdivisions cannot be inferred from the express authorization to the States because political subdivisions are components of the very entity the statute empowers."   501 U. S., at 607–608 (internal quotation marks, citations, and alterations omitted).

This case is a closer call than *Mortier*.   Here, the general preemption provision, § 14501(c)(1)—from which § 14501(c)(2)(A) excepts "the safety regulatory authority of a State"— explicitly preempts regulation both by "a State" and by a "political subdivision of a State."   The exception for state safety regulation is the first in a series of four statutory exceptions to the preemption rule.   The third exception in the series, covering regulation of prices for nonconsensual tow-truck services, matches the general preemption provision; it explicitly applies to the "authority of a State or a political subdivision of a State."   § 14501(c)(2)(C).   States and their political subdivisions are likewise linked in almost every other provision of § 14501.   See §§ 14501(a), 14501(b)(1), 14501(c)(3)(A), 14501(c)(3)(B), 14501(c)(3)(C).

Respondents Ours Garage and TRAO, in line with several Courts of Appeals, home in on the statute's repeated references to both States and their political subdivisions; in contrast, they urge, the singularly bare reference to "[s]tate" authority in § 14501(c)(2)(A)'s exception for safety regulation must mean that Congress intended to limit the exception to States alone.   See Brief for Respondents 15–16, 26–29.   Respondents rely particularly on *Russello* v. *United States*, 464 U. S. 16 (1983).   In that case, we observed: "Where Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.*, at 23 (internal quotation marks omitted) (cited in *Petrey*, 246 F. 3d, at 561; *Stucky*, 260 F. 3d, at 441; and *Tocher*, 219 F. 3d, at 1051). The dissent asserts the same argument vigorously. In its words: "The only conceivable reason" for the separate enumeration of States and their political subdivisions in § 14501(c)(1) is to *"establish . . .* two *separate categories* of state power—state power exercised through political subdivisions and state power exercised by the State directly—that are later treated differently in the exceptions to the rule." *Post*, at 445.

We acknowledge that § 14501(c)'s "disparate inclusion [and] exclusion" of the words "political subdivisions" support an argument of some force, one that could not have been made in *Mortier*. Nevertheless, reading § 14501(c)'s set of exceptions in combination, and with a view to the basic tenets of our federal system pivotal in *Mortier*, we conclude that the statute does not provide the requisite "clear and manifest indication that Congress sought to supplant local authority." 501 U. S., at 611.

Respondents Ours Garage and TRAO, as just noted, contrast the first statutory exception to § 14501(c)'s preemption rule, *i. e.*, the exception preserving "the safety regulatory authority of a State," § 14501(c)(2)(A), with the third exception, preserving the "authority of a State or a political subdivision to enact or enforce a law, regulation, or other provision relating to the price" charged for nonconsensual towing, § 14501(c)(2)(C). See Brief for Respondents 15–16. The nonconsensual towing exception tracks the language and structure of the general preemption rule, omitting only the reference to a "political authority of 2 or more States." Similarly styled, the fourth exception, for carrier-requested regulations in areas such as "uniform cargo liability" and antitrust immunity, § 14501(c)(3), completely parallels the word-

ing of § 14501(c)(1): It provides that preemption "shall not affect any authority of a State, political subdivision of a State, or political authority of 2 or more States to enact or enforce a law, regulation, or other provision" in those areas.

The safety exception of § 14501(c)(2)(A), however, does not borrow language from § 14501(c)(1). It simply states that preemption "shall not restrict the safety regulatory authority of a State." Notably, the second statutory exception, on which respondents train no attention, is stated with similar economy. That exception mentions neither States nor political subdivisions; it simply says that the general preemption rule, § 14501(c)(1), "does not apply to the transportation of household goods," § 14501(c)(2)(B). Yet it is abundantly clear that, notwithstanding this difference in verbal formulation, § 14501(c)(2)(B), like its neighbor § 14501(c)(2)(C), permits both state and local regulation. Accord, *post*, at 446 (SCALIA, J., dissenting).

The inclusion of the phrase "the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision" no doubt synchronizes the nonconsensual towing provision with § 14501(c)(1)'s main rule. The parallel structure of §§ 14501(c)(1) and 14501(c)(2)(C) does not imply, however, that § 14501(c)(2)(A)'s concise statement must be read to use the term "State" restrictively. Respondents' inference from the absence of "political subdivision of a State" in § 14501(c)(2)(A) would be more persuasive if the omission were the sole difference in the expression of the general rule and the safety exception. In contrast to §§ 14501(c)(2)(C) and (c)(3), however, neither the safety exception nor the household-goods exception refers to the "authority . . . to enact or enforce a law, regulation, or other provision."[2] The *Russello* presump-

---

[2] The dissent insists that § 14501(c)(2)(B) is irrelevant because its phrasing "ha[s] nothing to do with the issue of separating state and local authority." *Post*, at 446 (emphasis deleted). We ultimately draw the same conclusion, of course, regarding the phrasing of the safety exception in

tion—that the presence of a phrase in one provision and its absence in another reveals Congress' design—grows weaker with each difference in the formulation of the provisions under inspection.

Respondents' restrictive reading of the term "State," we note, introduces an interpretive conundrum of another kind. Section 14501(c)(1) preempts the power of both States and localities to *"enact or enforce* a law, regulation, or other provision."  (Emphasis added.)  Those conjoined words travel together.  If, as Ours Garage and TRAO argue, the safety exception of § 14501(c)(2)(A) reaches only States, then localities are preempted not only from enacting, but equally from *enforcing,* safety regulations governing motor carriers of property—even if those regulations are enacted by the state legislature.  It is unlikely that Congress would preserve States' power to enact safety rules and, at the same time, bar the ordinary method by which States enforce such rules—through their local instrumentalities.[3]

---

§ 14501(c)(2)(A).  The dissent, although it urges that "we should take seriously the references to States and subdivisions of States where they appear," *post,* at 447, rests upon the fact that subdivisions of States do *not* appear in the safety exception—as they also do not in the household-goods exception of § 14501(c)(2)(B).  That § 14501(c)(2) comprises three exceptions, each differently stated, seems to us indeed relevant to the interpretive weight that may be attached to the variation among them.

[3] Faced with this argument, the dissent is converted, however temporarily, to the view that "federal interference with the 'historic powers of the States' must be evinced by a 'plain statement.'"  *Post,* at 450, n. 4 (quoting *Gregory* v. *Ashcroft,* 501 U. S. 452, 461 (1991)).  The dissent finds no plain statement in § 14501(c)(1)'s prohibition on local enforcement because it can be read to mean only that "a political subdivision may not enact new laws or enforce *its previously enacted laws*" relating to motor carriage of property.  *Post,* at 450, n. 4.  This is by no means the most natural reading of the preemption provision.  The suggestion of the dissent is that, as applied to localities, § 14501(c)(1) preempts only local enforcement of *locally enacted* laws.  See *ibid.*  This interpretation raises the startling possibility that, although § 14501(c)(1) prohibits both States and localities

Finally, we reiterate, reading the term "State" as used in § 14501 to exclude political subdivisions would yield a decision at odds with our federal system's traditional comprehension of "the safety regulatory authority of a State," § 14501(c)(2)(A). To repeat the essential observation made in *Mortier:* "The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." 501 U. S., at 607–608 (internal quotation marks and alterations omitted). Whether and how to use that discretion is a question central to state self-government. See, *e. g., Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60, 71 (1978) (States enjoy "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them").

In Ohio, as in other States, the delegation of governing authority from State to local unit has long occupied the attention of the State's lawmakers. See D. Wilcox, Municipal Government in Michigan and Ohio: A Study in the Relations of City and Commonwealth 52–54, 63 (1896) (citing Ohio Const., Art. XIII (1851)). The Ohio Constitution currently grants municipalities within the State general authority "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with the general laws." Art. XVIII, § 3. Ohio's Legislature has enacted several statutes empowering cities to regulate motor vehicles and highways. See, *e. g.,* Ohio Rev. Code Ann. § 715.22 (Anderson 2000) (municipality may regulate motor vehicles and highways); § 723.01 ("Municipal corporations shall have special power to regulate the use of the streets."). Particularly relevant here, Ohio has exempted tow trucks from the State's regulation of motor carriers,

---

from "enact[ing]" new laws, it permits localities (but not States) to enforce previously enacted *state* laws relating to motor carriage of property.

§ 4921.02(A)(8), thus leaving tow-truck regulation largely to the cities, *Cincinnati* v. *Reed,* 27 Ohio App. 3d 115, 500 N. E. 2d 333 (1985).

It is the expressed intent of § 14501(c)(2)(A) that the preemption rule of § 14501(c)(1) "not restrict" the *existing* "safety regulatory authority of a State." Compare § 14501(c)(2)(A) with §§ 14501(c)(2)(B) and (C) (preemption "does not apply" to state or local power to regulate in particular areas), and § 14501(c)(3) (preemption rule "shall not affect" multistate, state, or local authority to regulate particular areas at the behest of carriers). Preemption analysis "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485 (1996) (internal quotation marks and citation omitted). Section 14501(c)(2)(A) seeks to save from preemption state power "in a field which the States have traditionally occupied." *Ibid.* (internal quotation marks and citation omitted). A saving provision of that order is hardly comparable to exercises of congressional *spending* authority that, as a condition for receipt of funds, explicitly restrict the prerogative of States to entrust governance of a matter to localities. Such programs typically make uniform statewide regulation a condition of funding, or, conversely, provide funds to localities on the condition that they be spent at that level in accordance with federal prescriptions and without state interference. See, *e. g.,* 23 U. S. C. § 153 (grants to support traffic safety conditioned on a motorcycle helmet law that applies "throughout the State"); § 158 (highway grants withheld unless "State has in effect a law" setting the drinking age at 21); 42 U. S. C. § 1396a(a)(1) (Medicaid grants available only if a State ensures that its plan for medical assistance is "in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them"); *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1,* 469 U. S.

256, 270 (1985) (State may not restrict local use of funds that the United States makes available to localities to spend at their discretion).[4]

This case, by contrast, deals not with States' voluntary agreements to relinquish authority vis-à-vis their political subdivisions in exchange for federal funds, but with preemption stemming from Congress' power to regulate commerce, in a field where States have traditionally allowed localities to address local concerns. Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), "not restrict" the preexisting and traditional state police power over safety. That power typically includes the choice to delegate the State's "safety regulatory authority" to localities. Forcing a State to refrain from doing so would effectively "restrict" that very authority. Absent a basis more reliable than statutory language insufficient to demonstrate a "clear and manifest purpose" to the

---

[4] Nor, the dissent's suggestion notwithstanding, see *post*, at 448, is § 14501 similar to the Clean Air Act, which mandates that States undertake an environmental planning process that of necessity cannot respect local political boundaries. See 42 U. S. C. §§ 7407(c), 7410(a)(1) (1994 ed.) (States must develop implementation plans for air quality in each of its "air quality control region[s]," whose borders are defined by the Administrator of the Environmental Protection Agency based not upon local jurisdictional lines but upon criteria she "deems necessary or appropriate for the attainment . . . of [national] ambient air quality standards"); cf. 33 U. S. C. § 1313(d)(1)(A) (under the Clean Water Act, each State must develop pollution abatement plans based upon a "priority ranking" of *all* "waters within its boundaries for which . . . effluent limitations . . . are not stringent enough to implement [applicable] water quality standard[s]"). Even so, States *may* delegate implementation authority under the Clean Air Act to their political subdivisions, subject to the requirement that the State bear ultimate oversight responsibility. See § 7410(a)(2)(E)(iii) (State must provide "necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any [state] plan provision, the State has responsibility for ensuring adequate implementation of such plan provision").

contrary, federal courts should resist attribution to Congress of a design to disturb a State's decision on the division of authority between the State's central and local units over safety on municipal streets and roads.

## III

The Court of Appeals supported its reading of § 14501(c)(2)(A) to disallow delegation from State to city in part by reference to the statute's deregulatory purpose. See *Petrey*, 246 F. 3d, at 563; accord, *Stucky*, 260 F. 3d, at 444–446; *Tocher*, 219 F. 3d, at 1048, 1051; *R. Mayer*, 158 F. 3d, at 546.   We now turn to that justification.

The Conference Report on the Federal Aviation Administration Authorization Act of 1994 observed that "[s]tate economic regulation of motor carrier operations . . . is a huge problem for national and regional carriers attempting to conduct a standard way of doing business."   H. R. Conf. Rep. No. 103–677, p. 87 (1994).   Carrying more weight, in the Act itself Congress reported its finding that "the regulation of intrastate transportation of property by the States" unreasonably burdened free trade, interstate commerce, and American consumers.   Pub. L. 103–305, § 601(a)(1), 108 Stat. 1605.   Congress therefore concluded that "certain aspects of the State regulatory process should be preempted." § 601(a)(2).   These declarations of deregulatory purpose, however, do not justify interpreting through a deregulatory prism "aspects of the State regulatory process" that Congress determined should *not* be preempted.

A congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of the exception.   Such a construction is surely resistible here, for § 14501(c)(1)'s preemption rule and § 14501(c)(2)(A)'s safety exception to it do not necessarily conflict.   The problem to which the congressional conferees attended was "[s]tate *economic* regulation";

the exemption in question is for state *safety* regulation. Corroboratively, the measure's legislative history shows that the deregulatory aim of the legislation had been endorsed by a key interest group—the American Trucking Association— subject to "some conditions that would allow regulatory protection to continue for non-economic factors, such as . . . insurance [and] safety." H. R. Conf. Rep. No. 103–677, at 88. The conferees believed that the legislation "address[ed] these conditions." *Ibid.;* see also *Ace Auto Body,* 171 F. 3d, at 776.

The construction of § 14501 that respondents Ours Garage and TRAO advocate, moreover, does not guarantee uniform regulation. On respondents' reading as on petitioners', a State could, without affront to the statute, pass discrete, nonuniform safety regulations applicable to each of its several constituent municipalities. Ohio thus could adopt the Columbus regulations to govern in that city, the Toledo regulations to govern there, and so on down the line. See Tr. of Oral Arg. 37–38. Indeed, because § 14501(c)(2)(A) refers only to "political" subdivisions, nothing in the statute's text would impede a State from creating an administrative agency organized into local offices, each of which could craft local rules suitable to its assigned jurisdiction. There is no reason to suppose that Congress meant to stop the States from spreading their authority among municipalities unless they employ such artificial or inefficient schemes.

Furthermore, 49 U. S. C. § 31141 (1994 ed.) affords the Secretary of Transportation a means to prevent the safety exception from overwhelming the lawmakers' deregulatory purpose. That provision authorizes the Secretary to void any "State law or regulation on commercial motor vehicle safety" that, in the Secretary's judgment, "has no safety benefit . . . [or] would cause an unreasonable burden on interstate commerce." §§ 31141(a), (c)(4); see also § 31132(8) ("'State law' includes [for the purposes of § 31141] a law enacted by a political subdivision of a State"); § 31132(9) (parallel definition of "State regulation"). Under this authority,

the Secretary can invalidate local safety regulations upon finding that their content or multiplicity threatens to clog the avenues of commerce.

We reiterate that § 14501(c)(2)(A) shields from preemption only "safety regulatory authority" (and "authority of a State to regulate . . . with regard to minimum amounts of financial responsibility relating to insurance requirements"). Local regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule.

\*     \*     \*

For the reasons stated, we hold that § 14501(c)(2)(A) spares from preemption local as well as state regulation. We express no opinion, however, on the question whether Columbus' particular regulations, in whole or in part, qualify as exercises of "safety regulatory authority" or otherwise fall within § 14501(c)(2)(A)'s compass. This question, which was not reached by the Court of Appeals,[5] remains open on remand.

The judgment of the United States Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins, dissenting.

The dispute in the present case arises from the fact that a reference to "State" power or authority can be meant to include *all* that power or authority, including the portion exercised by political subdivisions (as, for example, in the ordinary reference to "the State's police power"); but can also be

---

[5] Nor was it reached in *Petrey* v. *Toledo*, 246 F. 3d 548 (CA6 2001), which the Sixth Circuit stated "controls the disposition of this case," 257 F. 3d 506, 508 (2001). See *Petrey*, 246 F. 3d, at 563–564.

meant to include only that power or authority exercised at the state level (as, for example, in the phrase "State and local governmental authority"). The issue is whether, when 49 U. S. C. § 14501(c)(2)(A) (1994 ed., Supp. V) excepts from the preclusionary command of § 14501(c)(1) "the safety regulatory authority *of a State* with respect to motor vehicles," it means to except the safety regulatory authority of cities and counties as well. In my view it plainly does not.

I

There are four exceptions to the preclusionary rule of § 14501(c)(1), which read as follows:

"(2) MATTERS NOT COVERED.—[The preemption rule]—

"(A) shall not restrict the safety regulatory *authority of a State* with respect to motor vehicles, the *authority of a State* to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the *authority of a State* to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

"(B) does not apply to the transportation of household goods; and

"(C) does not apply to the *authority of a State or a political subdivision of a State* to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

"(3) STATE STANDARD TRANSPORTATION PRACTICES.—

"(A) CONTINUATION.—[The preemption rule] shall not affect any *authority of a State, political subdivision of a State, or political authority of 2 or more States* to

enact or enforce a law, regulation, or other provision, with respect to the intrastate transportation of property by motor carriers, related to—*[inter alia]* uniform cargo liability rules, . . . if such law, regulation, or provision meets the requirements of subparagraph (B)." §§ 14501(c)(2), (3) (emphases added).

It is impossible to read this text without being struck by the fact that the term "political subdivision of a State" is *added* to the term "State" in some of the exceptions, §§ 14501(c)(2)(C), (c)(3), but *not* in the exception at issue here, § 14501(c)(2)(A). " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello* v. *United States*, 464 U. S. 16, 23 (1983). The only way to impart some purpose and intent here is to assume that the word "State" is used in its narrower sense, so that political subdivisions are not covered by the term. The Court admits that the rule applied in *Russello* "support[s] an argument of some force," *ante*, at 434, that the exception for the "safety regulatory authority of a State" does not include local safety regulation.

But while the *Russello* argument is strong, it alone does not fully describe the *clarity* with which § 14501(c)(2)(A) excludes political subdivisions. For the clarity begins not just with the various exceptions, but with the very preemption rule to which the exceptions are appended. That rule reads:

"Except as provided [in §§ 14501(c)(2), (3)], a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U. S. C. § 14501(c)(1).

Since the lawmaking power of a political subdivision of a State is a subset of the lawmaking power of the State, *Hess v. Port Authority Trans-Hudson Corporation,* 513 U. S. 30, 47 (1994); *Wisconsin Public Intervenor v. Mortier,* 501 U. S. 597, 607–608 (1991), the preemption rule would have precisely the same scope if it omitted the reference to "political subdivision of a State." It is a well-established principle of statutory construction (and of common sense) that when such a situation occurs, when "two words or expressions are coupled together, one of which generically includes the other, it is obvious that the more general term is used in a meaning excluding the specific one." J. Sutherland, Statutes and Statutory Construction § 266, p. 349 (1891). The only conceivable reason for this specification of "political subdivision" apart from "State" is *to establish,* in the rule, the two *separate categories* of state power—state power exercised through political subdivisions and state power exercised by the State directly—that are later treated differently in the exceptions to the rule.

The situation is comparable to the following hypothetical using the term "football" (which may be used to include soccer, see Webster's New International Dictionary 983 (2d ed. 1950)): Assume a statute which says that "football and soccer shall not be played on the town green" (§ 14501(c)(1)), except that "football and soccer may be played on Saturdays" (§ 14501(c)(2)(C)), "football and soccer may be played on summer nights" (§ 14501(c)(3)(A)), and "football may be played on Mondays" (§ 14501(c)(2)(A)). In today's opinion, the Court says soccer may be played on Mondays. I think it clear that soccer is not to be regarded as a subset of football but as a separate category. And the same is true of "political subdivision" here.

## II

The Court reaches the opposite conclusion merely because § 14501(c) exhibits uneven drafting. First, the Court notes that § 14501(c)(2)(A) does not "trac[k] the language and

structure of the general preemption rule." *Ante,* at 434. Whereas other exceptions to the rule refer to the authority of a State or other political entity "to enact or enforce a law, regulation, or other provision," § 14501(c)(2)(A) merely refers to the "safety regulatory authority of a State." Second, the Court notes that another exception to the preemption rule, § 14501(c)(2)(B), is "stated with similar economy." *Ante,* at 435. It addresses merely the *subject* of regulation (transportation of household goods) instead of both the subject and the *source* of regulation (a State, political subdivision, or political authority of two or more States). This has, the Court notes, the same effect as its neighbor, § 14501(c)(2)(C), of permitting both state and local regulation.[1] *Ibid.* These inconsistencies in the statute's drafting style, the Court contends, undermine the conclusion we would ordinarily draw from the absence of the term " 'political subdivision' " in § 14501(c)(2)(A). *Ibid.*

The weakness of this argument should be self-evident. How can inconsistencies of style, *on points that have nothing to do with the issue of separating state and local authority,* cause the text's crystal-clear distinction between state and local authority to disappear? It would certainly reflect more orderly draftsmanship if the statute consistently used the formulation "to enact or enforce a law, regulation, or other provision," rather than replacing it in § 14501(c)(2)(A) with the equivalent phrase "regulatory authority of a State"; and if the statute referred to subject matter alone (à la § 14501(c)(2)(B)) either never at all, or else *whenever* the exception applied to all three categories of States, subdivisions of States, and political authorities of two or more States.

---

[1] Not only is this point (as the text proceeds to discuss) irrelevant in principle; it is misleading in its description of fact, suggesting that the two neighboring sections produce the same result with different language. It is true enough that § 14501(c)(2)(C), like § 14501(c)(2)(B), permits both state and local regulation. But § 14501(c)(2)(C), *unlike* § 14501(c)(2)(B), also permits regulation by a "political authority of 2 or more States."

But it is impossible to imagine how this imperfect drafts-
manship in unrelated matters casts any doubt upon the pre-
cise meaning of the subject-matter-plus-source provisions
where they appear. Unless the Court is appealing to some
hitherto unknown canon of interpretation—perhaps (bor-
rowed from the law of evidence) *negligens in uno, negligens
in omnibus*—the diverse styles of § 14501(c)'s exceptions
have nothing to do with whether we should take seriously
the references to States and subdivisions of States where
they appear.

What is truly anomalous here is not the fact that the ter-
minology of § 14501(c) is diverse with regard to presently ir-
relevant matters, but the fact that the Court has today come
up with a judicial interpretation of § 14501(c) that renders
the term "political subdivision of a State," which appears
throughout, *utterly superfluous* throughout. Although the
Court claims that the ."*Russello* presumption . . . grows
weaker with each difference in the formulation of the provi-
sions under inspection," *ante*, at 435–436, it cites no author-
ity for that proposition—nor could it, because we have rou-
tinely applied the *Russello* presumption in cases where a
statute employs different "verbal formulation[s]" in sections
that include particular language and in sections that omit
such language. See, *e. g., Barnhart* v. *Sigmon Coal Co.,* 534
U. S. 438, 452–454 (2002); *Duncan* v. *Walker,* 533 U. S. 167,
173–174 (2001); *Hohn* v. *United States,* 524 U. S. 236, 249–250
(1998); *United States* v. *Gonzales,* 520 U. S. 1, 5 (1997).

## III

Lacking support in the text of the statute, the Court in-
vokes federalism concerns to justify its decision. "Absent a
basis more reliable than statutory language insufficient to
demonstrate a 'clear and manifest purpose' to the contrary,"
the Court reasons, "federal courts should resist attribution
to Congress of a design to disturb a State's decision on the
division of authority between the State's central and local

units over safety on municipal streets and roads." *Ante,*
at 439–440. Well of course we think there is "clear and man-
ifest purpose here"; but besides that, the Court's federalism
concerns are overblown. To begin with, it should not be
thought that the States' power to control the relationship
between themselves and their political subdivisions—their
"traditional prerogative . . . to delegate" (or to refuse to dele-
gate) "their authority to their constituent parts," *ante,* at
429—has hitherto been regarded as sacrosanct. To the con-
trary. To take only a few examples,[2] the Federal Govern-
ment routinely gives directly to municipalities substantial
grants of funds that cannot be reached or directed by "the
politicians upstate" (or "downstate"), see, *e. g.,* Office of Man-
agement and Budget, 2001 Catalog of Federal Domestic
Assistance AEI–1 to AEI–29; *Lawrence County* v. *Lead-
Deadwood School Dist. No. 40–1,* 469 U. S. 256, 270 (1985);
and many significant federal programs require laws or reg-
ulations that must be adopted by the state government
and cannot be delegated to political subdivisions, see, *e. g.,*
42 U. S. C. § 1396a(a) (Medicaid); 23 U. S. C. §§ 153, 158
(Federal-Aid Highway System); 42 U. S. C. §§ 7407(a), 7410
(1994 ed.) (Clean Air Act).[3] This "interference" of the Fed-

---

[2] The Court thinks these examples are "hardly comparable" to § 14501(c)
because many involve Spending Clause legislation. *Ante,* at 438. A
sufficient answer is that one of them does not, see 42 U. S. C. § 7410 (1994
ed.) (Clean Air Act), and that other examples not involving Spending
Clause legislation could be added, see, *e. g.,* 33 U. S. C. §§ 1313(d), 1362(3)
(Clean Water Act). But in any event, a siphoning off of the States' "his-
toric powers" to delegate has equally been achieved, whether it has come
about through the coercion of deprivation of Spending Clause funds or
through other means. The point is that it is not unusual for Congress to
interfere in this matter.

[3] The Court thinks the Clean Air Act is a bad example merely be-
cause a State can rely on political subdivisions to *enforce* the State's
implementation plan. *Ante,* at 439, n. 4; see 42 U. S. C. §§ 7407(a),
7410(a)(2)(E)(iii). So what? Only *States* may adopt implementation
plans; this duty cannot be delegated to localities. Moreover, as I explain in

eral Government with the States' "traditional prerogative . . . to delegate their authority to their constituent parts" has long been a subject of considerable debate and controversy. See, *e. g.*, Hills, Dissecting the State: The Use of Federal Law to Free State and Local Officials from State Legislatures' Control, 97 Mich. L. Rev. 1201 (1999).

With such major impositions as these already on the books, treating § 14501(c)(1) as some extraordinary federal obstruction of state allocation of power is absurd. That provision preempts the authority of political subdivisions to regulate "a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder *with respect to the transportation of property.*" (Emphasis added.) The italicized language massively limits the scope of preemption to include only laws, regulations, and other provisions that single out for special treatment "motor carriers of property." § 14501(c). States *and political subdivisions* remain free to enact and enforce general traffic safety laws, general restrictions on the weight of cars and trucks that may enter highways or pass over bridges, and other regulations that do not target motor carriers "with respect to the transportation of property." In addition, the exception contained in § 14501(c)(2)(A) allows a State—but not a political subdivision—to apply special safety rules (rules adopted under its "safety regulatory authority") to motor carriers of property.[4]

---

n. 4, *infra,* the statute at issue here is no different. Under 49 U. S. C. §§ 14501(c)(1) and (c)(2)(A), a State may enact regulations pursuant to its "safety regulatory authority" and rely on localities to *enforce* those regulations.

[4] This interpretation of the statutory scheme "introduces an interpretive conundrum of another kind," the Court asserts, because § 14501(c)(1) declares that a political subdivision may not *"enact or enforce"* laws, regulations, or other provisions relating to motor carriers of property. *Ante,* at 436. In the Court's view, if the term "State" does not include "subdivision of a State," § 14501(c)(1) will prevent a State from relying on localities

This relatively modest burden on the "historic powers of the States" to delegate authority to political subdivisions, *Gregory* v. *Ashcroft*, 501 U. S. 452, 461 (1991) (internal quotation marks omitted), is unambiguously imposed by the statute. The Court repeatedly emphasizes the fact that § 14501(c)(2)(A) declares that § 14501(c)(1) shall " 'not restrict' the *existing* 'safety regulatory authority of a State,' " *ante,* at 438—which, it says, "includes the choice to delegate . . . to localities," *ante,* at 439. This entirely begs the question, which is *precisely* whether the statute's reference to the authority of a "State" includes authority possessed by a municipality on delegation from the State. As I have described, the text and structure of the statute leave no doubt that it does not—that "State" does not include "subdivision of a State." Even when we are dealing with the traditional powers of the States, "[e]vidence of pre-emptive purpose is sought in the *text and structure* of the statute at issue." *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993) (emphasis added); see also *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947).

---

to "enforce" rules adopted under its "safety regulations." *Ante,* at 435–436. But the conclusion that § 14501(c)(1) prevents a political subdivision from enforcing regulations *enacted by the State* can only be reached by ignoring (for this issue) the rule that the Court is so insistent upon elsewhere: that federal interference with the "historic powers of the States" must be evinced by a "plain statement," *Gregory* v. *Ashcroft,* 501 U. S. 452, 461 (1991). A natural reading of the phrase "a . . . political subdivision of a State . . . may not enact or enforce a law"—and a reading faithful to *Gregory's* plain statement rule—is that a political subdivision may not enact new laws or enforce *its previously enacted laws.* The Court believes this reading "raises the startling possibility," *ante,* at 436, n. 3, that § 14501(c)(1) prevents States but not political subdivisions from enforcing *previously enacted state regulations* relating to motor carriage of property. I think not. A possibility so startling (and unlikely to occur) is well enough precluded by the rule that a statute should not be interpreted to produce absurd results. The municipalities' reserved power to enforce state law does not include the power to enforce state law that the State has no continuing power to enact or enforce.

\* \* \*

I believe the text and structure of § 14501(c) show plainly that "the safety regulatory authority of a State" does not encompass the authority of a political subdivision. For this reason, I respectfully dissent.