KHOUZAM, Judge.
Kevin Lawless prevailed in the trial court against Joe Nagy Towing, Inc. (JNT), on a theory of conversion after the towing company towed his truck and sold it at a public auction. JNT appeals from the judgment, raising five issues on appeal. We affirm the judgment in all respects but write to address JNT’s argument, raised for the first time on appeal, that the trial court lacked subject matter jurisdiction to hear the case because 49 U.S.C. § 14501(c)(1) (2006) preempts Lawless’s conversion claim. As Lawless’s common law conversion claim was not “related to” the “price, route, or service” of any motor carrier as those terms have been applied by the United States Supreme Court, we hold that it was not preempted.
FACTS AND PROCEDURE
At trial, Lawless testified that he drove his truck to a convenience store on June 21, 2006. He had recently undergone surgery on both knees, and because he parked the truck on an incline, he experienced difficulty getting back inside it after making his purchases. In what appeared at the time to be a fortunate turn of events, a friend of Lawless’s arrived at the store, observed his predicament, and offered him a ride home. Thankful, Lawless accepted the offer. But when he returned early the next morning to retrieve his truck, it was gone.
Lawless was able to determine from an employee of the convenience store that the truck had been towed by JNT. Lawless called the number listed for the towing service and reached Joe Nagy himself. Lawless identified himself and informed Nagy that he would like to retrieve his truck. Nagy described the location of the office and how much was owed on the vehicle. Lawless testified he made it clear *871 that he intended to retrieve his vehicle and was not abandoning it.
Lawless was then arrested for an unrelated incident on June 27 and would remain incarcerated until December. Lawless testified that during the two weeks following his arrest, he made four or five collect calls from prison to JNT, but none of them were accepted. Lawless testified that the phone service he used identified him by name and specified that the call was coming from prison.
Shortly after Lawless’s incarceration, a family member contacted a Massachusetts attorney with whom Lawless’s family had a longstanding relationship to help retrieve the truck. The attorney testified he called JNT on July 19 and asked to speak with Joe Nagy directly. The person who answered the phone identified himself as Joe Nagy’s brother and told the attorney that Joe Nagy was not available. The attorney informed the employee that he was representing Lawless and asked to make arrangements to pay the bill on the truck and have it removed from the tow yard. The attorney further explained that Lawless was incarcerated and that he would be making whatever payment was required on Lawless’s behalf. The individual on the other end of the line refused to provide any information about the truck or what steps should be taken to retrieve it without Joe Nagy there in person. The attorney left his name and telephone number for Joe Nagy to call him back when he returned. The attorney testified that he never received a return call from anybody at JNT.
Foreseeing further difficulty in retrieving the truck, that same day the Massachusetts attorney contacted an attorney in Naples, Florida to handle the matter. The Massachusetts attorney told the Naples attorney he would make whatever payments were necessary to obtain the truck, including towing and storage fees. The Naples attorney testified at trial that he called JNT several times, and each time he identified himself as Lawless’s attorney, explained that Lawless was incarcerated, and asked what he could do to retrieve the truck. But each time he called, the person who answered explained that Joe Nagy was unavailable and refused to provide any information or answer any questions without Joe Nagy there in person. The only information the Naples attorney could obtain was that he could not go pick up the truck himself. He left his name and number each time he called, but like the first attorney, he never received any return calls from anybody at JNT. Further, during none of these discussions did anyone at JNT ever mention that the truck was to be auctioned.
It was eventually discovered that the Naples attorney had a conflict in representing Lawless, so a third attorney was retained to retrieve the truck. That attorney testified he called JNT at least three times, and his testimony reveals he received the same treatment as the previous two. Each time he called, he identified that he was representing Lawless, explained that Lawless was incarcerated, and offered to pay whatever was owed on the truck and have one of Lawless’s relatives pick it up. Each call, however, was fruitless: the employee invariably responded that Joe Nagy was unavailable and refused to answer any questions or provide any information on how to retrieve the truck. Likewise, despite calling numerous times to arrange to recover the truck, nobody ever informed the attorney that the truck was scheduled to be auctioned on August 11. And just as the previous two had, this attorney left his name and number each time and asked that Joe Nagy call him back to resolve the matter.
*872 Unlike the first two, however, the third attorney did receive a return call from Joe Nagy. Only the call did not come until August 11, over a month after JNT had begun receiving calls about Lawless’s truck, and — more notable — immediately after it had been auctioned. This was the first time since Lawless’s incarceration that he or his attorneys spoke with Joe Nagy and the first time anyone at JNT mentioned an auction. Joe Nagy did not inform the attorney during this conversation that he purchased the vehicle himself.
Joe Nagy testified that he personally towed Lawless’s truck. He claimed he only received two calls regarding the truck: the one Lawless testified to making shortly after the tow and one from an out-of-town attorney shortly before the auction. Nagy’s trial and deposition testimony offered two different accounts of the phone call from the attorney. Nagy testified that although he spoke with Lawless’s attorney four days before the auction, he did not notify the attorney of his intention to auction the truck, much less of the date of the auction. Instead, he merely asserted that the attorney still had “plenty of time to get the vehicle.”
Nagy testified that JNT followed the lien notice requirements of section 713.585, Florida Statutes (2006), by timely sending a letter to Lawless’s last-known address and posting an ad in the newspaper. Nagy also testified that he did not know Lawless was incarcerated until after the truck had been auctioned. But he testified that even if he had known that Lawless was incarcerated, he would not have taken any further actions beyond those listed in the statute. According to Nagy, this was all the law required, even though three different attorneys had been making numerous attempts to arrange to pay for and retrieve the truck and he conceded to speaking to one of them four days before the auction.
The public auction took place as scheduled. Nagy testified at trial that he has held many such auctions in the past because they are statutorily required before he can obtain title to the vehicles his company tows without the owner’s consent. He testified that although on rare occasions members of the public have attended the auctions, “[ujsually nobody ever shows up.” Indeed, he testified that in ten years of public auctions, people not associated with JNT have appeared “maybe two” times. This auction was no different, and at its conclusion Nagy obtained title to Lawless’s vehicle for $1,636, the cost of the towing and storage. Nagy subsequently sold the truck to a third party for a value of approximately $18,000.
At the conclusion of the bench trial, the judge found that although Lawless’s fraud and civil theft claims had not been proven, he had carried his burden on the conversion count. Importantly, Lawless did not claim that JNT wrongfully towed his truck; rather, he alleged that JNT’s subsequent actions constituted conversion. The trial judge found that, in light of the numerous reasonable attempts by various attorneys and Lawless himself to retrieve the truck, JNT’s complete failure to cooperate and to even address the upcoming auction constituted interference with the dominion of the true owner.[1]
*873 JNT timely appealed, raising five issues. As applied to the facts of this case, we conclude the trial court’s ruling was correct. But we write to address an argument the trial court did not have an opportunity to consider because it was not raised below.
APPLICABLE LAW
On appeal, JNT argues that the trial court lacked subject matter jurisdiction to hear Lawless’s claim because conversion claims against towing companies have been preempted by The Interstate Commerce Act, as amended by the Federal Aviation Administration Authorization Act of 1994 and the Interstate Commerce Commission Termination Act of 1995. Specifically, JNT argues that Lawless’s claim was “related to” a “price, route, or service” of JNT, a motor carrier, and therefore 49 U.S.C. § 14501(c)(1) (2006) preempts its enforcement. Although the issue of federal preemption was never raised below, it “is a question of subject matter jurisdiction,” Boca Burger, Inc. v. Forum, 912 So.2d 561, 568 (Fla.2005), and therefore can be raised at any time, even for the first time on appeal, 84 Lumber Co. v. Cooper, 656 So.2d 1297, 1298 (Fla. 2d DCA 1994).
Congress amended the Interstate Commerce Act when it enacted the Federal Aviation Administration Authorization Act (FAAAA) in 1994 and again when it enacted the Interstate Commerce Commission Termination Act in 1995. See City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 429, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). In relevant part, the Act as amended provides that “a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.” § 14501(c)(1). Tow trucks qualify as “motor carriers of property” within the scope of the statute. See City of Columbus, 536 U.S. at 430, 122 S.Ct. 2226.
Pursuant to the supremacy clause of the United States Constitution, no state can assert jurisdiction where Congress clearly intended to preempt a field of law. U.S. Const. art. VI, cl. 2; see Jacobs Wind Elec. Co., Inc. v. Dep’t. of Transp., 626 So.2d 1333, 1335 (Fla.1993). In deter mining whether a state law is federally preempted, “ ‘we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.’ ” City of Columbus, 536 U.S. at 432, 122 S.Ct. 2226 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Concluding that a law is preempted should be avoided “ ‘in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.’ ” Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)).
Where, as here, the language of preemption is express, a reviewing court “must nonetheless ‘identify the domain expressly pre-empted’ by that language.” Medtronic, Inc. v. Lohr, 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). For matters the States have historically regulated through their police powers, a court is required to “apply a presumption in favor of a narrow interpretation of any express preemption clause.” HTS Indus., Inc. v. Broward *874 Cnty., 852 So.2d 382, 385 (Fla. 4th DCA 2003); see also Medtronic, 518 U.S. at 485, 116 S.Ct. 2240 (acknowledging that such an “approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety”). Doubts must be resolved against preemption. H.T.S., 852 So.2d at 385.
In all preemption cases, the “ ‘ultimate touchstone’” for determining the scope of preemption is the purpose of Congress. Medtronic, 518 U.S. at 485, 116 S.Ct. 2240 (quoting Retail Clerks Int’l. Ass’n. Local 1625 v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)). “As a result, any understanding of the scope of a pre-emption statute must rest primarily on ‘a fair understanding of congressional purpose.’” Medtronic, 518 U.S. at 485-86, 116 S.Ct. 2240 (quoting Cipollone, 505 U.S. at 530, n. 27, 112 S.Ct. 2608). This exercise in statutory interpretation requires a court to “not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy” in determining whether Congress intended to preempt the state law at issue. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (internal quotations omitted).
The Supreme Court of the United States has interpreted the language at issue in this case more than once. In Morales v. Trans World Airlines, Inc., 504 U.S. 374, 391, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Court held that the fare advertising provisions of the National Association of Attorneys Generals’ Air Travel Industry Enforcement Guidelines are preempted by the Airline Deregulation Act (ADA) of 1978. The Court interpreted a portion of the ADA containing language substantially similar to that in section 14501(c)(1)[2] and determined that the words “relating to” require a broad application. Id. at 383-84, 112 S.Ct. 2031. The Guidelines explicitly referenced air fares and imposed obligations that “would have a significant impact upon the airlines’ ability to market their product, and hence a significant impact upon the fares they charge.” Id. at 390, 112 S.Ct. 2031. For these reasons, the Court concluded that the Guidelines are “related to” the “rates” of air carriers and are therefore preempted. Id. at 388, 112 S.Ct. 2031.
In so concluding, the Court acknowledged that “ ‘some state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner’ to have pre-emptive effect.” Id. at 390, 112 S.Ct. 2031 (alteration in original) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100, n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The Morales Court specifically declined to address “state regulation of the nonprice aspects of fare advertising,” but noted that although some state laws — like those prohibiting obscene depictions — would also “relate to” air rates, “the connection would obviously be far more tenuous.” 504 U.S. at 390, 112 S.Ct. 2031.
The Supreme Court revisited the language of section 14501(c)(1) in Rowe v. New Hampshire Motor Transport Ass’n., 552 U.S. 364, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008). There, the issue was whether section 14501(c)(1) preempts provisions of a Maine law regulating tobacco delivery within the state. Id. at 367, 128 S.Ct. 989. The law in question, An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors, had two relevant pro *875 visions: the first forbade anyone other than tobacco retailers licensed in Maine to accept orders for tobacco deliveries, and the second prohibited any person from knowingly transporting a tobacco product to anyone in Maine unless either the sender or receiver was licensed in Maine for this purpose. Id. at 368-69, 128 S.Ct. 989.
The Court began its analysis by noting that Morales controls because of the similarities in language between the ADA and the FAAAA. Rowe, 552 U.S. at 370, 128 S.Ct. 989. Addressing once again the focus of the state law and its impact, the Court noted that the state law at issue expressly “focuse[d] on trucking and other motor carrier services,” and required carriers to offer “delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate.” Id. at 371-72, 128 S.Ct. 989. Consequently, because the state statute “produce[d] the very effect that the federal law sought to avoid, namely, a State’s direct substitution of its own governmental commands for ‘competitive market forces’ in determining (to a significant degree) the services that motor carriers will provide,” the Court found that the Maine law is preempted. Id.
After concluding that the state laws are preempted, the Rowe Court took the time to address the scope of its holding. It clarified that only those laws with “a ‘significant impact’ on carrier rates, routes, or services” are preempted. Id. at 375, 128 S.Ct. 989. The Court specifically observed that the state law at issue did not “affect truckers solely in their capacity as members of the general public” and that it had a “connection with trucking [that] is not tenuous, remote, or peripheral.” Id. Further, it emphasized that “[t]he state statutes aim directly at the carriage of goods, a commercial field where carriage by commercial motor vehicles plays a major role.” Id. at 375-76, 128 S.Ct. 989.
The Court proceeded to describe suggestions from the Solicitor General that would have accomplished Maine’s goals in passing the tobacco delivery regulations without venturing into federally preempted territory. Among these were that the state could “prohibit all persons from providing tobacco products to minors” and that “it might pass other laws of general (non-carrier-specific) applicability.” Id. at 376-77, 128 S.Ct. 989. Therefore, although the Court in Rowe declined to recede from Morales ’ broad interpretation of the words “related to,” it made clear that, without more, the fact that a state law may have some conceivable application to members of the trucking industry does not automatically result in preemption.
ANALYSIS
A. Congressional Intent
Beginning, as we must, with the assumption that Congress did not intend to supersede the historic police powers of the states to enforce conversion claims against towing companies, we look for contrary manifestations of Congressional intent. The Conference Report on the FAAAA provides an illustrative view of the purposes behind the relevant portion of the Act. See H.R. Rep. No. 103-677 (1994), 1994 U.S.C.C.A.N. 1715 (Conf. Rep.); see also City of Columbus, 536 U.S. at 440-41, 122 S.Ct. 2226 (referring to the same Conference Report for guidance as to Congressional intent in interpreting section 14501).
According to the Report, the main purpose behind the 1994 Amendment directed at motor carriers was to “as completely as possible level the playing field between air carriers on the one hand and motor carriers on the other with respect to intrastate *876 economic trucking regulation.” Id. at 82. The Report describes that the Amendment was enacted in response to a Ninth Circuit decision resulting in different treatment of organizations providing the same basic service depending on whether they were classified as air carriers or motor carriers. Id. at 86; see also Fed. Express Corp. v. Cal. Pub. Util. Comm’n., 936 F.2d 1075 (9th Cir.1991).
The conferees considered the “sheer diversity” of the ensuing patchwork regulations among the States to be “a huge problem for national and regional carriers attempting to conduct a standard way of doing business.” H.R. Rep. No. 103-677, at 87, 1994 U.S.C.C.A.N. 1715, 1760. The Report indicates that the solutions adopted by the States caused “significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtailed] the expansion of markets.” Id. The “[t]ypical forms of regulation” sought to be preempted included those regarding “entry controls, tariff filing and price regulation, and types of commodities carried.” Id. at 86. The conferees believed that preemption of these regulations was necessary to facilitate interstate commerce. Id. at 87.
In short, the Conference Report leaves little doubt that the purpose of the Amendment was to facilitate uniform economic regulations for organizations providing interstate and intrastate transportation services by air or ground. Nothing in the detailed Report suggests that Congress intended to preempt or in any way affect civil conversion claims. Rather, it appears that the expressed Congressional intent would be far better served by allowing the States to retain their historic police powers in this context and continue to enforce common law conversion claims against those carriers who elect not to follow the rules. If JNT’s argument is correct that Congress intended conversion claims like Lawless’s to fall within the scope of section 14501(c)(l)’s preemption clause, then towing companies (and other “motor carriers,” for that matter) around the country could convert others’ property with impunity. The injustices that would result are too great to have been intended by Congress, particularly via legislation expressly addressing entirely different issues.
B. Controlling Supreme Court Precedent
Additionally, the Supreme Court’s interpretation of section 14501(c)(1) does not support JNT’s argument. Even though the Court has more than once interpreted the words “related to” broadly, it has been equally clear that the scope of the statute’s preemption is not unlimited. Both Morales and Rowe dealt with state legislation expressly aimed at the trucking industry and having a direct, significant impact on interstate commerce. And the Court in both cases unambiguously observed that general state laws directed at noneconomic, industry-neutral harms are in far less danger of preemption. Finally, even state laws having a conceivable impact on carrier prices, routes, or services are not automatically preempted; rather, “the state laws whose ‘effect’ is ‘forbidden’ under federal law are those with a ‘significant impact.’ ” Rowe, 552 U.S. at 375, 128 S.Ct. 989 (quoting Morales, 504 U.S. at 388, 390, 112 S.Ct. 2031).
Here, in contrast to those in Morales and Rowe, the state law could not be more general or industry-neutral. For well over a century, Florida courts have generally defined conversion as a wrongful act which deprives an owner of property of its use. See, e.g., Robinson v. Hartridge, *877 13 Fla. 501, 514 (Fla.1869)[3] (“an act inconsistent with the general right of dominion and control of the owner of the property”); Star Fruit Co. v. Eagle Lake Growers, 160 Fla. 130, 33 So.2d 858, 860 (1948) (“the wrongful deprivation of a person of property to the possession of which he is entitled”); Mayo v. Allen, 973 So.2d 1257, 1258 (Fla. 1st DCA 2008) (“an unauthorized act which deprives another of his property permanently or for an indefinite time”). It is thus neither aimed at, nor would its continued enforcement have any conceivable impact upon, interstate trucking commerce. Any connection between Florida’s common law prohibition on conversion and the prices, routes, or services of motor carriers is consequently too “tenuous, remote, or peripheral” to require preemption. Accordingly, subject to the limitations discussed below, we hold that section 14501(c)(1) does not preempt enforcement of common law conversion claims like Lawless’s.
As the Supreme Court has in similar circumstances, we feel it is prudent to identify the limited scope of our holding. We hold only that in the appropriate case, common law conversion claims are not automatically preempted by virtue of the fact that the defendant is a towing company. As noted above, Lawless has not attacked the tow itself or any subsequently arising “price” or “service” — to the contrary, Lawless was willing to pay the price for the tow and the storage. Instead, the theory of conversion upon which he prevailed was that once JNT began receiving a series of calls from Lawless and his attorneys reasonably attempting to pay for and retrieve the truck, JNT was required to do something more than ignore them.
Viewed properly, the conversion claim did not “relate to” any price, route, or service; instead it only concerned the subsequent illegal refusal to hand over the property of another despite multiple reasonable requests. This is textbook conversion as it has been defined for generations, and the fact that JNT may have had authority to tow the truck originally does not alter the result. See, e.g., Robinson, 13 Fla. at 515 (“[a] finding of property, or a possession acquired in any lawful manner, does not justify acts inconsistent with and in violation of the rights of the true owner”).
C. Other Courts
We recognize that some courts in other jurisdictions have come to the opposite conclusion in addressing similar claims. See, e.g., Ware v. Tow Pro Custom Towing & Hauling, Inc., 289 Fed.Appx. 852 (6th Cir.2008); Weatherspoon v. Tillery Body Shop, Inc., 44 So.3d 447 (Ala.2010); A.J.’s Wrecker Serv. of Dallas, Inc. v. Salazar, 165 S.W.3d 444 (Tex.App.2005). Although each of these cases involves a conversion claim against a towing company following a non-consensual tow, they are all materially distinguishable from the case at bar. In AJ.’s, the appellant alleged that the tow itself was wrongful and constituted conversion. 165 S.W.3d at 447. The appellant in Ware argued that both the insufficient notice of storage fees and the fees themselves constituted conversion. 289 Fed.Appx. at 854. Finally, Weatherspoon involved no allegations that the appellant vehicle owner communicated in any way *878 with the towing company; instead, she acted “without knowledge that [the towing company] had towed” the car until after it was auctioned. 44 So.3d at 448-49.
Each of those claims more directly addressed the towing company’s services than the claim we consider here, and each was arguably more “related to” the preemptive aims of section 14501(c)(1). Additionally, we note that in reaching the conclusion that conversion claims are preempted, those courts engaged in statutory interpretation of the phrase “related to” to determine the scope of the explicit preemption in section 14501(c)(1) without a meaningful analysis of congressional purpose. But as noted above, the Supreme Court of the United States has repeatedly instructed that the “ultimate touchstone” for determining the scope of preemption is Congressional intent. Medtronic, 518 U.S. at 485, 116 S.Ct. 2240.
CONCLUSION
We found nothing in the text of the statute, in the accompanying conference report, or in controlling Supreme Court precedent that suggests the intended effect of section 14501(c)(1) was to prohibit or even affect the historic State enforcement of conversion claims in this context, and we cannot conceive that Congress intended such a disruption.
Affirmed.
ALTENBERND and KELLY, JJ, Concur.

. Stated differently, the trial court appears to have held that literal compliance with the lien notice requirements of section 713.585 — ■ which appears by its repeated references to customers and repairs to be aimed more at mechanics than towing companies — is insufficient to protect a lienor from a later tort action for conversion when the vehicle's owner has affirmatively and repeatedly contacted the lienor to explain that he is no longer at his last known address and has designated an attorney to resolve the matter for him.

. That portion contained a preemption provision "prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier.” Morales, 504 U.S. at 378-79, 112 S.Ct 2031 (quoting 49 U.S.C.App. § 1305(a)(1) (1988)).

. The tow truck did not exist until 1916, after Ernest Holmes Sr. and others spent eight hours extracting a car from a ditch using nothing more than simple tools and manpower. See Univ. of Tenn. at Chattanooga, Entrepreneurial Hall of Fame Inducts Three, http:// www.utc.edu/news07/ehf.php (May 17, 2007). Consequently, we note that Florida had conversion claims before it had tow trucks.